Samuel M. Brown (State Bar No. 308558)
**HENNIG KRAMER LLP**
3600 Wilshire Blvd, Suite 1908
Los Angeles, CA 90010
Tel: +1 213 310 8301
Fax: +1 213 310 8302
sam@employmentattorneyla.com

Parisis G. Filippatos (*to be admitted pro hac vice*)
Tanvir H. Rahman (*to be admitted pro hac vice*)
Gabrielle L. Rosen Harvey (*to be admitted pro hac vice*)
**FILIPPATOS PLLC**
425 Madison Avenue, Suite 1502
New York, NY 10017
Tel: 212 202 0234
Fax: 914 459 1141
Pgf@filippatoslaw.com
trahman@filippatoslaw.com
grosenharvey@filippatoslaw.com

*Attorneys for Plaintiff Mary Katherine Koons*

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/31/2024 8:42 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Tarasyuk, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY LOS ANGELES

### WESTERN DISTRICT

| | |
|---|---|
| MARY KATHERINE KOONS, a/k/a SCARLETT BURKE, <br><br> *Plaintiff*, <br><br> v. <br><br> AUDIO UP INC., ANTHEM ENTERTAINMENT L.P., and JARED GUTSTADT <br><br> *Defendants*. | Case No.: 24STCV34600 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> 1. Sex Trafficking Arising Under California Trafficking Victims Protection Act § 52.5.; <br> 2. Battery, Including Sexual Battery, Arising Under California Law; <br> 3. Sexual Assault Pursuant to the California Sexual Abuse and Cover Up Accountability Act, Cal. Civ. Proc. ¶ 340.16 <br> 4. Sex Based Discrimination, Arising Under FEHA; <br> 5. Sexual Harassment, Arising Under FEHA; <br> 6. Retaliation, Arising Under FEHA; <br> 7. Failure to Prevent, Arising Under FEHA; <br> 8. Defamation, Arising Under Cal. Lab. Code 1050. |

COMPLAINT

Plaintiff Mary Katherine Koons a/k/a Scarlett Burke, by and through her attorneys, FILIPPATOS PLLC and HENNIG KRAMER LLP, hereby complains of Defendants Audio Up Inc. ("**Audio Up**") and Anthem Entertainment L.P. ("**Anthem**") and Jared Gutstadt ("**Mr. Gutstadt**") (collectively, "**Defendants**"), upon personal knowledge, as well as information and belief, by alleging and averring as follows:

## NATURE OF ACTION

1.      Arising in the wake of actress Blake Lively's public condemnation of the dark, unspoken underbelly of Hollywood, where it is the victims of sexually hostile work environments who are far too often the ones smeared, shamed and defamed, this case involves facts as tragic as they are familiar in the entertainment world, centering around a powerful music mogul who considers himself so much above the law (both moral and societal) that he preys upon a fledgling artist with a vicious rapacity that dehumanizes and ultimately enslaves her.

2.      At a time when powerful and influential men like Harvey Weinstein, Robert Sylvester Kelly ("R Kelly"), and Sean Combs ("P Diddy"), have been indicted or convicted for ensnaring their female victims in a suffocatingly lawless web of violence, lies, threats, and false promises that rob these women of all agency over their bodies, careers, and emotional lives, this action is commenced against "Jingle" Jared Gutstadt, the hugely successful music publishing and media tycoon, to stop the next such Hollywood tragedy.

3.      In the face of an all-but-assured retaliatory campaign of relentless victim shaming and spreading of lies meant to smear and ruin her, Mr. Gutstadt's victim, artist Mary Katherine Koons, who goes by the stage name of Scarlett Burke, courageously brings forth this action aimed at holding Mr. Gutstadt and Audio Up, and Anthem Entertainment — the corporate entities that have enabled and benefited from his lawless behavior against Ms. Koons — accountable for: (i) sex trafficking under the California Victims Protection Act, Cal. Civil Code § 52.5; (ii) sex discrimination and retaliation under California's Fair Employment and Housing Act, Cal. Gov't

COMPLAINT

Code § 12940 *et seq.* ("FEHA"), specifically § 12940(a) (proscribing discrimination), § 12940(j) (proscribing sexual harassment), § 12940(i) (failure to prevent), and § 12940(h) (proscribing retaliation); (iii) failing to prevent discrimination and retaliation arising under FEHA, specifically Cal. Gov't Code § 12940(k); (iv) defamation under Cal. Lab. Code. 1050; and (v) battery, including sexual battery, under Cal. Civ. Code §1708.5 and the California Penal Code ("CPC") §261(a).

### INTRODUCTION

4.    This is a sex trafficking, sexual assault, and employment discrimination and retaliation case centered around Jared Gutstadt, a powerful music industry figure who preyed on a young woman's dreams, perverting her ambition against her into a weapon of manipulation, abuse, and sex trafficking, all while masking his predatory behavior behind the false façade of professional opportunity and feigned love.

5.    Mr. Gutstadt systematically stripped Plaintiff Mary Katherine Koons (who has gone by the stage name of Scarlett Burke for the past eight years) of her autonomy, dignity, and security, leaving her trapped in a terrible cycle of control and domination for his own gratification and gain.

6.    Mr. Gutstadt is a music executive and entrepreneur known for founding Jingle Punks, a prominent music production and publishing company, as well as Audio Up, a podcast studio and network, which has purportedly redefined audio entertainment.

7.    Mr. Gutstadt rose to prominence in the entertainment industry, establishing himself as a key figure in the creation of music for television, film, and advertising.

8.    However, behind his amiable public persona, Mr. Gutstadt engaged in a pattern of abusive and coercive behavior, mostly against women, that spanned over seven years.

COMPLAINT

9. For Ms. Koons, the glitz and glamour of the industry masked a harrowing reality. Ms. Koons, a talented artist who crossed paths with Mr. Gutstadt in 2017, was soon trapped in a cycle of manipulation, abuse, and exploitation.

10. Among other violent and unlawful acts, Mr. Gutstadt:

- Manipulated Ms. Koons into a sexual relationship under the guise of advancing her career;

- Subjected Ms. Koons to repeated sexual assaults, including rape;

- Physically assaulted Ms. Koons, often leaving her with bruises and other injuries throughout her body;

- Isolated Ms. Koons from professional opportunities unless she complied with his sexual and logistical demands; and

- Engaged in stalking, harassment, intimidation, and retaliation when Ms. Koons attempted to escape from his clutch, causing her significant and irreparable financial and professional harm.

11. Ms. Koons met Mr. Gutstadt when she was 27 years old and he was 39, and he quickly used his influence and power to entrap her into an immediately coercive and toxic relationship. Mr. Gutstadt used his connections in the music industry to lure Ms. Koons with promises of success, only to exploit her vulnerability and control her personal and professional life for his selfish pleasure.

12. Throughout their poisonous relationship, Mr. Gutstadt's unlawful behavior escalated, with his acts of violence, intimidation, and sexual coercion against Ms. Koons becoming more frequent and severe over time. Despite Ms. Koons's repeated attempts to escape his hold, Mr. Gutstadt leveraged his industry power to keep her bound to him, ensuring her silence and obedience.

13. Ms. Koons endured years of psychological manipulation, physical violence, and sexual abuse, leading to severe emotional and psychological trauma. The relentless pattern of

COMPLAINT

abuse culminated in an environment where Ms. Koons felt she had no choice but to comply with Mr. Gutstadt's sexual demands, to avoid the horrifying consequences of refusing him.

14.     After years of suffering in silence, Ms. Koons seeks to hold Mr. Gutstadt (and those that enabled and supported him) accountable for the profound harm he caused her and to prevent him from perpetrating his violence, coercion, manipulation, and abuse against other vulnerable women whom he may target for sexual slavery in the future.

15.     Ms. Koons is pursuing justice in this action for the years of her life lost to Mr. Gutstadt's twisted plan to dominate her, seeking relief under laws protecting victims of sex discrimination, retaliation, sexual abuse, and human trafficking.

## DEFENDANTS

## AUDIO UP MEDIA

16.     Audio Up Media, founded in January 2020 by Mr. Gutstadt, is a podcast studio and network that has purportedly redefined audio entertainment.

17.     The company specializes in scripted musical podcasts, blending original scores and compelling narratives to create immersive storytelling experiences.

18.     Since its inception, Audio Up has attracted significant investments.

19.     In May 2020, the company secured a $4.5 million investment from MGM Studios.

20.     The following year, 2021, it garnered additional funding from notable investors, including the artist known as The Weeknd.

21.     By 2022, Audio Up raised another $10 million in investments, further solidifying its position as a leader in audio innovation.

22.     The company has collaborated with prominent figures, including author Stephen King, crime novelist James Ellroy, musicians like Machine Gun Kelly and Miranda Lambert, actor Jason Alexander, and President Trump's former attorney Michael Cohen.

COMPLAINT

23. Recognized as a trailblazer in the industry, Audio Up has received critical acclaim for its contributions to audio entertainment.

## ANTHEM ENTERTAINMENT L.P.

24. Anthem Entertainment, previously branded as Ole Media Management, is a leading independent music company renowned for its substantial investments in music rights and its wide-reaching influence in the industry.

25. Anthem, headquartered in Toronto, Ontario, maintains a significant presence across key industry hubs, with established offices in Los Angeles, California (9000 Sunset Blvd., West Hollywood, CA 90069), Nashville, Tennessee, and New York, New York.

26. Since its establishment in 2004, the company has strategically acquired a range of music catalogs and expanded its operations globally.

27. Anthem's diverse portfolio spans music publishing, production music, and recorded music, allowing it to partner with songwriters, composers, and artists across genres.

28. In 2014, Anthem Entertainment acquired film and television music rights from Sony Pictures for a reported $130 million.

29. This acquisition was followed by the 2015 purchase of Jingle Punks, a company founded and controlled by Jared Gutstadt with whom Anthem has continued to partner on joint ventures and other profitable endeavors to this day, which solidified Anthem's presence in the music production space.

30. By 2016, Anthem had secured a $500 million credit facility, deploying over $520 million in acquisitions. These included rights to songs recorded by iconic artists such as Beyoncé, Taylor Swift, Madonna, Michael Jackson, Rihanna, Jay-Z, and Justin Timberlake.

31. In addition to these acquisitions, Anthem has continued to strengthen its catalog by purchasing the music rights to Ricky Reed's works, which include collaborations with artists like Lizzo, Halsey, Meghan Trainor, and Leon Bridges.

6

COMPLAINT

32.     More recently, in 2024, Anthem announced a publishing joint venture with Mr. Gutstadt and his company, Audio Up.

33.     This partnership equips Audio Up with substantial financial resources and access to Anthem Entertainment's extensive funding network, enabling the company to expand its operations and invest in larger-scale projects.

34.     At all relevant times, Anthem was acting as a joint employer alongside Audio Up and Mr. Gutstadt by exerting substantial financial control and decision-making power over Ms. Koons's professional opportunities and working conditions, particularly through her employment and contractual relationships with Jingle Punks.

35.     Anthem directly benefited from Ms. Koons's labor and maintained oversight of the creative projects on which she worked, including decisions related to her compensation and intellectual property. Through its executives, such as Jason Klein, CEO of Anthem Entertainment, Anthem further entrenched its role as a joint employer by influencing key contractual agreements and career-defining decisions, effectively sharing control over Ms. Koons's employment with Audio Up and Mr. Gutstadt. This dual control underscores Anthem's responsibility for the unlawful treatment Ms. Koons endured.

### JARED GUTSTADT

36.     Jared Gutstadt, a name ubiquitous in the music industry, is a two-time Emmy nominee, three-time Cannes Lion winner, and renowned music entrepreneur and producer who has worked with high-profile artists across film, television, and music, including Lynryd Skynyrd, Steven Tyler, Lil Wayne, Bob Dylan, Jelly Roll, Machine Gun Kelly, Miranda Lambert, Nas, and Zac Brown, just to name a few.

COMPLAINT

37.     In 2008, Mr. Gutstadt founded a company called Jingle Punks, which at the time was called the "fastest growing resource for indie, production, and high-quality custom music…."[1]

38.     Since its inception, Jingle Punks has garnered frequent media coverage, including in CNN and *Billboard*. Mr. Gutstadt has also been featured multiple times in the Los Angeles Times and in *Variety*, where he was celebrated as a "mogul" for his groundbreaking work in podcasts and his leadership at Audio Up.

39.     In 2010, Mr. Gutstadt raised venture capital funding for Jingle Punks and has since raised four more rounds of investments at undisclosed amounts.

40.     In 2012, the William Morris Endeavor Agency ("WME") acquired a majority stake in Jingle Punks for, upon information and belief, $75 million.

41.     Mr. Gutstadt stayed on as Jingle Punks's CEO until 2020 and has continued to hold a substantial stake in the company.  He also holds several technology patents for music discovery.

42.     In 2015, Jingle Punks was sold to Ole Music Publishing (now Anthem) for an undisclosed amount.

43.     Just recently, in October 2024, Slipstream, a company that claims to be the largest royalty-free music platform, acquired Anthem Entertainment's production music business, which included Jingle Punks.

44.     In 2020, Mr. Gutstadt founded Audio Up, a production studio and platform for podcasts.  Mr. Gudstadt is being named and sued in his personal and professional capacities.

---

[1]     *See* https://www.pehub.com/hammerline-capital-invests-in-jingle-punks-music/ (last visited December 31, 2024).

COMPLAINT

45.     Under Mr. Gutstadt's leadership, Audio Up has become a major player in the music industry.

## JURISDICTION

46.     This Court has personal jurisdiction pursuant to California Code of Civil Procedure § 410.10, as all Defendants maintain significant contacts with the State of California.

47.     Defendant Jared Gutstadt is domiciled in Los Angeles, California, at 1957 Mandeville Canyon Road, Los Angeles, California 90049.

48.     Defendant Audio Up, Inc. is headquartered at 1957 Mandeville Canyon Road, Los Angeles, California 90049.

49.     At all relevant times, Defendant Anthem Entertainment conducted business with Mr. Gutstadt within the State of California, and a substantial portion of its operations occurred in California.

50.     This Court has general subject matter jurisdiction pursuant to California Code of Civil Procedure § 410.10, as this Complaint raises questions under California law.

51.     Plaintiff's claims arise from conduct and events that occurred within the State of California, including Los Angeles County.

52.     Each Defendant has significant contacts with the state, and their actions have directly impacted the Plaintiff in California.

53.     Accordingly, this Court has subject matter jurisdiction and personal jurisdiction over the Defendants.

## VENUE

54.     Venue is proper in this judicial district pursuant to California Code of Civil Procedure § 410.10.

55.     Mr. Gutstadt lives and does business in Los Angeles County.

56.     Audio Up is headquartered in Los Angeles County.

COMPLAINT

9

57.     Anthem Entertainment has conducted significant business and maintains an office in Los Angeles County.

58.     Unlawful employment practices alleged herein were committed in Los Angeles County.  For example, as discussed below, Defendant, Jared Gutstadt, raped Plaintiff in Los Angeles County. (*See e.g., infra* ¶ B (vi)).

59.     In addition, as discussed below, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the county of Los Angeles.

**FACTUAL BACKGROUND**

A.     **Ms. Koons's Background and Professional Accomplishments**

60.     Ms. Koons was born in Amarillo, Texas.  Her passion for the arts began in elementary school, where her love for theater and film flourished.  With her parents' unwavering support, she started acting classes and signed with her first agent at the young age of 13.

61.     Around the same time, her curiosity about her mother's old acoustic guitar sparked a love for music. When her mother saw her interest, she gifted Ms. Koons her own Fender acoustic guitar, along with a chord progression book, nurturing her creativity and setting her on a path to becoming the multi-talented artist she is today.

62.     After graduating high school in 2007, Ms. Koons moved to Los Angeles in 2008 to pursue her dreams. She began by working as an extra on film and television sets, including playing a dead body on an episode of "Criminal Minds" and a speaking role in "We Bought a Zoo" that earned her membership in the Screen Actors Guild ("SAG").

63.     To support herself, Ms. Koons took on odd jobs and eventually ventured into modeling, booking campaigns for clients like Estée Lauder, Cartier, and Salvatore Ferragamo. These opportunities allowed Ms. Koons to fund acting classes and workshops, leading to roles in nationwide commercials for Infiniti, Microsoft, Lancôme, KFC, and Toyota, and co-star appearances on shows like "Lethal Weapon" and "Ray Donovan."

COMPLAINT

64.     While building her acting career, Ms. Koons also explored her musical talents. For eight years, she performed original songs every Monday night at The Red Door of Toluca Lake, honing her skills as a singer and songwriter. The experience not only solidified her identity as an artist but also earned her a loyal following.

65.     A true triple threat—singer, songwriter, and actor—Ms. Koons has built her career on determination and talent, guided by a deep love for the arts and a family who has supported her passion since day one.

66.     Among some of her most notable accomplishments in the entertainment industry, Ms. Koons has written songs for Miranda Lambert, directed Billy Bob Thornton, and collaborated on a song with Jelly Roll.  Most recently, Ms. Koons secured a co-star role in the highly anticipated Taylor Sheridan series, "The Madison." Her songwriting talents have extended globally, with her works from the Anthem catalog being licensed across numerous TV shows and films. Despite these significant accomplishments, the challenges she has faced have overshadowed what should have been a thriving and celebrated career.

**B.      Ms. Koons Meets Mr. Gutstadt and, for the Next Seven Plus Years, He Physically, Verbally, and Sexually Abuses Her**

67.     In May 2017, Ms. Koons, who goes by the stage name Scarlett Burke, met Mr. Gutstadt. As detailed below, within two short months, after grooming her and gaining her trust, he sexually assaulted her for the first time.

**i.      2017 (Sexual Assault and Predatory Grooming)**

68.     In May 2017, Ms. Koons met Mr. Gutstadt at the Peppermint Club in West Hollywood, California, where his band, The Jingle Punks Hipster Orchestra, held a residency.

69.     Upon their first encounter, Mr. Gutstadt immediately fixated on Ms. Koons, taking an unrelenting interest in her.

COMPLAINT

70.    At the time, Ms. Koons was 27 years old, while Mr. Gutstadt, a 39-year-old industry veteran over a decade her senior, capitalized on the power imbalance between them.

71.    The very next day, Aaron Liberman, Mr. Gutstadt's assistant, contacted Ms. Koons's then-theatrical manager, Jami Wrenn, to arrange a meeting between Ms. Koons and Mr. Gutstadt at the Jingle Punks office in Los Angeles, California.

72.    In the weeks that followed, Mr. Gutstadt launched a calculated campaign to groom Ms. Koons, bombarding her with messages about prestigious career opportunities designed to captivate and overwhelm her.

73.    He lured her with invitations to exclusive dinners in West Hollywood alongside high-profile music and TV executives such as Steve Levitan, Jason Flom, Jay Sures, Jae Goodman, Ben Silverman, Kevin Healey, T Bone Burnett, and Kallie Khouri.

74.    In addition to these promises, he invited her on trips to Nashville and Lake Tahoe under the guise of collaborating on music projects for Ole Music, Jingle Punks' former parent company, further entangling her in his web of influence.

75.    These actions were part of a deliberate grooming process designed to manipulate her sense of loyalty, create a false sense of indebtedness, and coerce her into a closer and more dependent relationship under his control.

76.    On May 30, 2017, Mr. Gutstadt once again invited Ms. Koons to the Jingle Punks office, introducing her to his team, including Matt Chambless, the Executive Creative Director at Jingle Punks, as part of his efforts to gain her trust and admiration.

77.    Just days later, on June 1, 2017, Mr. Gutstadt took Ms. Koons to an exclusive dinner with prominent television executives and the head of United Talent Agency ("UTA"), further presenting himself as a powerful industry insider capable of advancing her career.

12

COMPLAINT

78.     Enthralled by the opportunities he dangled before her, Ms. Koons believed that the well-connected and influential Mr. Gutstadt could be instrumental in helping her establish a successful career in the music industry.

79.     Within a week of their initial meeting, Mr. Gutstadt escalated his efforts, requesting that she record "Let the Dice Roll," a song he planned to pitch as the theme for the Netflix show "Girls Incarcerated." This marked the start of her employment with Jingle Punks and her entrapment in his manipulative control.

80.     In or around June 2017, Netflix acquired "Let the Dice Roll," yet Mr. Gutstadt exploited the opportunity to further demean Ms. Koons by paying her a mere five hundred dollars and keeping the rights for himself—a glaring underpayment that disregarded the value of her work and contribution.

81.     Around this time, following a dinner in Los Angeles, California, with several prominent music executives, Mr. Gutstadt offered to drive Ms. Koons back to her apartment in Studio City, a neighborhood in Los Angeles, California.

82.     The gesture appeared generous, as it was nearly an hour out of his way from his home in Santa Monica, California.

83.     Upon arriving at her apartment, Mr. Gutstadt began incessantly pressuring Ms. Koons for a kiss.

84.     Despite her attempts to laugh it off, he persisted, saying, "Come on, how about one on the cheek?"

85.     Feeling cornered and uncomfortable, Ms. Koons reluctantly agreed to a kiss on the cheek.

86.     However, in a calculated and predatory move, Mr. Gutstadt suddenly turned his head at the last moment, tricking her into kissing him on the lips.

COMPLAINT

87.    Immediately following this unwelcome kiss, he laughed mockingly and exclaimed, "Gotcha!"

88.    For Ms. Koons, this was not a playful act but the first instance of an assault that disregarded her boundaries and established a pattern of exploitation and abuse.

89.    The next day, Ms. Koons confronted Mr. Gutstadt, expressing her discomfort with what had happened.

90.    His actions, however, had already begun to erode her sense of safety and autonomy, signaling the start of a manipulative and abusive dynamic.

91.    In or around July 2017, Mr. Gutstadt invited Ms. Koons to Nashville, Tennessee for a week of writing sessions with him and his team and to meet with executives at Ole Music.

92.    Ms. Koons coordinated her trip with Mr. Liberman.

93.    However, the day before her departure, communication was redirected to Dana Dentana, who had no formal role with Jingle Punks but occasionally attended social drinking events with Mr. Gutstadt.

94.    Ms. Dentana informed Ms. Koons that the hotel where Mr. Gutstadt was staying was fully booked, so she would be arranging accommodations for Ms. Koons at a motel in Brentwood, Tennessee, a thirty-minute drive away from Mr. Gutstadt's hotel.

95.    Ms. Koons was confused, given that this change occurred so close to her departure.

96.    Nevertheless Ms. Koons was excited for the opportunity to go to Nashville and work with Mr. Gutstadt and those at Ole Music.

97.    However, as soon as she arrived, it was clear that the accommodations were far from the "very nice" hotel Ms. Dentana had promised—instead Ms. Koons had been put in a motel along the interstate.

COMPLAINT

98.    There were people loitering outside Ms. Koons's motel room who were openly doing drugs.

99.    Ms. Koons was also followed into her hotel room by a fan who had recognized her earlier in the day from her role in "Animal Kingdom."

100.    As a woman alone in an unfamiliar city, Ms. Koons felt extremely unsafe.

101.    The next day, July 12, 2017, Ms. Koons asked Mr. Gutstadt to move her to a different hotel.

102.    Mr. Gutstadt assured Ms. Koons that she could stay at the hotel where he was staying, which she greatly appreciated given the previous night's events.

103.    However, upon arriving at the Thompson Hotel in Nashville, where Mr. Gutstadt was staying, Ms. Koons realized that Mr. Gutstadt meant she could stay *with* Mr. Gutstadt in his room.

104.    Ms. Koons was completely shocked and taken aback.

105.    Ms. Koons resolved that after this night, she would return to Los Angeles and never see Mr. Gutstadt again.

106.    However, being in an unfamiliar city with nowhere else to go, she felt she had no choice but to stay.

107.    It was clear, however, that Mr. Gutstadt was taking advantage of Ms. Koons's vulnerable situation, fully aware that she had nowhere else to stay that night.

108.    That night was the first night Mr. Gutstadt sexually assaulted Ms. Koons.

109.    He forcibly grabbed her hand and put it on his penis, insisting that they were not doing anything wrong.

110.    Desperately trying to resist, but fearing for her safety, Ms. Koons expressed her discomfort to Mr. Gutstadt, but he brushed it off and ignored her pleas for him to stop.

15

COMPLAINT

111.   It was clear that Mr. Gutstadt was coercing Ms. Koons into having sex with him, despite the fact that he was married with children. When Ms. Koons expressed concern about his wife, Mr. Gutstadt brushed it aside, assuring her that he and his wife were separated but living under the same roof.

112.   The following day, Ms. Koons's flight back to Los Angeles was cancelled.

113.   Mr. Gutstadt had already flown to his family's cottage in Canada to be with his wife and children.

114.   Ms. Koons felt like she had no choice but to sleep on the floor of the airport.

115.   She could not bring herself to contact Jingle Punks or anyone at Ole Music to request another hotel room, as the thought of reaching out to anyone connected with Mr. Gutstadt filled her with shame and humiliation.

116.    Ms. Koons felt unworthy of even the basic decency of a safe place to stay after the violation and degradation she had endured the night before, which had stripped away every ounce of her self-respect.

117.   This was the first of myriad times when Ms. Koons experienced trauma bonding— a dynamic where the person inflicting harm knocks their victim down to their lowest point, only to position themselves as the one offering support to pull them back up.

118.   Each time Ms. Koons endured trauma at the hands of Mr. Gutstadt, he would return, not with an apology or any acknowledgment of what he had done, but with the promise of another seemingly extraordinary career opportunity.

119.   This cycle of abuse and manipulation persisted for the next seven and a half years, keeping Ms. Koons trapped in a pattern of exploitation and control constructed by Mr. Gutstadt.

16

COMPLAINT

120.   In the months that followed, Mr. Gutstadt overwhelmed Ms. Koons with lavish gifts and gestures, including guitars, concert tickets, freelance work opportunities, expensive dinners, and exclusive invitations to Emmy Awards parties.

121.   At the same time, Mr. Gutstadt deliberately isolated Ms. Koons from the people in her life who might have supported her—including her manager, Ms. Wrenn, who, like many others, recognized that something was wrong and tried to separate Ms. Koons from Mr. Gutstadt.

122.   Wielding his power and influence over Ms. Koons forcefully, Mr. Gutstadt manipulated her into believing that he alone could help her achieve success in the industry, further entrenching her reliance on him while alienating her from those who could have intervened.

123.   Mr. Gutstadt's manipulative tactics paved the way for his coercive sexual relationship with Ms. Koons.

124.   Leveraging his power, professional network, and success, Mr. Gutstadt used his company, Jingle Punks, to further entrap Ms. Koons.

125.   By way of example, in or around August 2017, Mr. Gutstadt invited Ms. Koons to Jingle Punks' company retreat in Lake Tahoe, Nevada under the pretense of networking with other composers, as well as the Jingle Punks team.

126.   The prospect of professionally connecting with other Jingle Punks composers and staff was an opportunity Ms. Koons could not reject at that point in her career, and she agreed to attend the retreat.

127.   However, upon her arrival, Ms. Dentana informed Ms. Koons that she would not be staying in the accommodations typically reserved for composers like herself, but instead in a hotel reserved for company executives.

COMPLAINT

128. To her shock, it was only upon arriving at the Edgewood Resort that Ms. Koons discovered she would once again be required to stay in Mr. Gutstadt's room.

129. This revelation made it abundantly clear that Mr. Gutstadt's invitation to the retreat was yet another calculated and deceitful ploy to manipulate Ms. Koons and coerce her into sleeping with him under the guise of professional opportunity—effectively turning her into his sex slave.

130. Indeed, Ms. Koons was not included in any of the team building activities or photos.

131. As an aspiring new artist, Ms. Koons felt pressured to stay to avoid missing an opportunity to advance her career.

132. It soon became clear that the atmosphere at Jingle Punks and Anthem was heavily misogynistic, with Mr. Gutstadt as the ringleader of belittling women, especially any woman of success in the entertainment business.

133. Notably, at this retreat, a female Jingle Punks composer, woke up with a male Jingle Punks music supervisor in her hotel room attempting to assault her.

134. The female employee reported her assault to Michelene Starnadori, an SVP at Jingle Punks, but no action was taken.

135. When Mr. Gutstadt told Ms. Koons about the assault, he shamelessly bragged about being at lunch with Conan O'Brian and Jeff Ross at the Cannes Lions Awards when he received the news, and later flippantly joked about getting "MeToo'd."

136. Notably, despite his awareness, Mr. Gutstadt did nothing to address the very serious situation.

COMPLAINT

137.    This behavior epitomized the toxic culture that was allowed to thrive at Jingle Punks—an environment where women who reported assault or harassment were met with indifference and subjected to mockery rather than support or action.

138.    Around this time, Matt Chambless, the Executive Creative Director at Jingle Punks, came into Ms. Koons's recording session at the Jingle Punks studio in Santa Monica, California and interrupted her recording session by proceeding to massage her shoulders unbidden and in front of the sound engineer, while casually asking how things were going.

139.    After Ms. Koons made it clear that she was not interested in any personal interaction with him, Mr. Chambless retaliated by mocking and belittling her, frequently referring to her as "Jared's plaything" whenever she was at the Jingle Punks studio.

140.    Despite Ms. Koons's repeated attempts to address this mistreatment by bringing it to Mr. Gutstadt's attention, he dismissed her concerns, brushing off Chambless's behavior by saying he was just a "miserable person" and advising her to ignore it.

141.    In September 2017, Mr. Gutstadt invited Ms. Koons to Las Vegas, Nevada for his 40th birthday and the iHeart Music Awards, enticing Ms. Koons with the opportunity to meet Gayle Troberman, President, Marketing and Chief Marketing Officer at iHeartMedia Inc.

142.    This was one of many examples of Mr. Gutstadt flaunting his status to manipulate the young and vulnerable Ms. Koons.

143.    Ms. Koons accepted Mr. Gutstadt's invitation.

144.    While in Las Vegas, Mr. Gutstadt brought his male colleagues to the Sapphire Gentlemen's Club (the "Sapphire Club"), leaving Ms. Koons with no option but to join them as the only other women invited on the trip were escorts that Mr. Gutstadt had flown in from Los Angeles.

COMPLAINT

145.    Notably, Mr. Gutstadt took Ms. Koons back to the Sapphire Club on numerous occasions although she repeatedly expressed her discomfort.

146.    Ms. Koons quickly found herself lured into an intermittent extramarital affair with Mr. Gutstadt—who kept insisting that he was getting a divorce from his wife—who would also constantly resort to coercion and manipulation to convince Ms. Koons that she had to stay with him in order to advance her career—a proposition she believed she could not turn down.

147.    Mr. Gutstadt repeatedly flew Ms. Koons to Nashville to collaborate with local artists on songwriting projects.

148.    The songs Ms. Koons wrote during this period became crucial to Mr. Gutstadt's company, Audio Up's, success.

149.    However, Ms. Koons did not reap the benefits of her work, as Mr. Gutstadt and Anthem still owns all rights to her music.

150.    In or around October 2017, Corus Entertainment, a leading Canadian media company with extensive television, radio, and digital platforms, partnered with Ole Music to make Ole Music the primary supplier of production music across its network.[2] This partnership marked a significant milestone for Jingle Punks, as Ole Music's leadership and resources unlocked new opportunities for growth and innovation. By positioning Jingle Punks' music at the forefront of Corus Entertainment's extensive media network, Ole Music helped amplify its visibility and licensing potential in a competitive market. The collaboration not only showcased Jingle Punks' diverse catalog but also solidified its reputation as a go-to production music provider, with Ole Music's backing ensuring consistent success and market influence.

---

[2]    See    https://www.businesswire.com/news/home/20171011005257/en/ole-Becomes-Primary-Supplier-of-Production-Music-to-Corus-Entertainment (last visited December 31, 2024).

COMPLAINT

### ii. **2018 (Verbal and Physical Abuse)**

151.    In or around January 2018, Ms. Koons attended a three-day "writing camp" with Mr. Gutstadt at the Deutsch Ad Agency in Culver City, California.

152.    Out of the nine composers at the camp, Ms. Koons was the only female.

153.    Ms. Koons landed three out of the five available commercial spots, resulting in a huge payday for Jingle Punks.

154.    In recognition of landing these commercial spots, Mr. Gutstadt bought Ms. Koons a custom Nick Fouquet hat, a gesture meant to seduce her and draw her further into his orbit.

155.    However, months later, in what was one of the more vivid examples of verbal abuse that Ms. Koons endured, after learning that an executive from the Deutsch Agency had reached out to Ms. Koons about working together again, Mr. Gutstadt became enraged and went off on Ms. Koons, scolding her about "loyalty," and calling her a "supreme fool" and a "joke" who knew nothing about how the business worked.

156.    Ms. Koons was compelled to write back to the executive and tell him that any further work would need to be run through Mr. Gutstadt and Jingle Punks.

157.    Shortly thereafter, Ms. Koons began to distance herself from Mr. Gutstadt and began dating Joe Purdy, a singer/songwriter.

158.    However, despite her clear rejection of Mr. Gutstadt, Mr. Gutstadt continued to demand Ms. Koons spend time with him by inviting her out to lavish dinners with the promise of meeting major publishers, agents, and producers.

159.    Around this time, Mr. Gutstadt's prominence in the entertainment industry was further solidified by featured pieces in publications like *Hot 97*, which described him as

COMPLAINT

"Hollywood's biggest punk" working with some of the most renowned names in hip-hop.[3] Celebrated for his collaborations with high-profile rappers, including DJ Khaled and Jason "Poo Bear" Boyd, and his innovative approach to music and media, he cultivated a public image as a trailblazer in the industry.

160.    On numerous occasions, Mr. Gutstadt invited Ms. Koons to his office in Santa Monica, California, under the guise of "free studio space" to record music.

161.    In reality, the studio space was never "free," as Mr. Gutstadt still own all rights to the music Ms. Koons recorded during these sessions.

162.    On or around July 10, 2018, Mr. Gutstadt flew Ms. Koons to Las Vegas for another "writing session."

163.    However, upon her arrival, Ms. Koons discovered once again that she would have to stay in Mr. Gutstadt's room. This again demonstrated that the only way Ms. Koons would be able to work with Mr. Gutstadt was to comply and have sex with him.

164.    To make matters worse, when Ms. Koons tried to join the writing session, it quickly became evident that she was not wanted in the session.

165.    It was painfully clear to Ms. Koons that Mr. Gutstadt had only brought her to Las Vegas for sex, using his celebrity status and lavish gifts to manipulate Ms. Koons once again.

166.    In the ensuing months, Mr. Gutstadt continued to tell Ms. Koons that he was getting a divorce.

167.    Simultaneously, Mr. Gutstadt began to assert total financial control over Ms. Koons, further entrenching his dominance and leaving her increasingly dependent on him for her livelihood and career opportunities.

---

[3]    See https://www.hot97.com/news/meet-jared-gutstadt-hollywoods-biggest-punk-thats-working-with-your-favorite-rappers/ (last visited December 31, 2024).

COMPLAINT

22

168. For instance, Mr. Gutstadt paid for Ms. Koons to have her own band, hired her for work, and even secured her a gig as the opener for Hunter Hayes at Winston House.

169. Once he had established her financial dependence, the abuse escalated significantly, with Mr. Gutstadt exploiting her vulnerability to intensify his control and inflict greater harm.

170. For example, on the evening of August 28, 2018, Ms. Koons performed at the Whiskey Jam in Nashville.

171. When Ms. Koons got off the stage, another female artist approached her, irate that she had performed a song that had been co-written by herself and another artist—a complete misunderstanding.

172. She claimed that Ms. Koons had stolen the song, which was written by her and Mr. Alagia, and was naturally upset with Ms. Koons for performing it.

173. At the time, Mr. Gutstadt had a cameraman following him for his biopic.

174. Mr. Gutstadt did not want this interaction filmed and shoved the cameraman out of the way, forcefully grabbing Ms. Koons's arm and pulling her out of the venue.

175. As they walked, Mr. Gutstadt berated Ms. Koons for blocks, telling her that Mr. Alagia only wanted to work with her to have sex with her and "pass her along to his friends."

176. Ms. Koons was staying in the same hotel room as Mr. Gutstadt on this trip, and despite her desperate desire to avoid returning there with him, she had no other options.

177. Mr. Gutstadt also allowed his friends and business acquaintances to sexually harass and assault Ms. Koons without repercussions.

178. By way of example, on August 29, 2018, Ms. Koons attended a dinner at The Catbird Seat, one of Max Goldberg's restaurants in Nashville, with Mr. Gutstadt, Mr. Goldberg, Jeff Peters, J.R. Moore, and several other male composers and NFL players.

COMPLAINT

23

179.    Still on edge from the previous night, Ms. Koons was hoping to remain inconspicuous.

180.    However, once again, Ms. Koons became a target of harassment. Mr. Goldberg asked Ms. Koons in front of the table, "Scarlett, how much would you charge to suck my cock? Actually, any cock for that matter?"

181.    Ms. Koons immediately left the restaurant crying but Mr. Gutstadt stayed at the restaurant and continued drinking.

182.    A few of the other men who were seated with them at table—and whom Ms. Koons had just met—were decent enough to leave the restaurant to comfort her.

183.    Notably, this was not the first time Mr. Goldberg harassed Ms. Koons.

184.    In fact, the first time Ms. Koons met Mr. Goldberg, Mr. Goldberg offered Ms. Koons a free guitar if she stripped down naked and ran across the roof of one of his bars.

185.    A few months later, during their second interaction, the two were in Los Angeles when Mr. Goldberg told Ms. Koons that he needed to go back to his hotel room to drop off a book he had been carrying.

186.    Once in his hotel room, he began running the bathtub. Ms. Koons immediately began to worry that they were not there to "just drop off a book."

187.    Unfortunately, Ms. Koons's intuition was right when Mr. Goldberg said, "I thought we could take a bath" and proceeded to undress.

188.    He then pinned Ms. Koons against a wall and put his hands on opposite sides of her head, trapping her. He then got really close to her face and said, "do you ever think about the size of my cock?"

189.    Ms. Koons, fearing for her life, ducked under his arms, ran out of the hotel room and got into an Uber.

COMPLAINT

190.    The next day, Ms. Koons, needing someone to confide in, called Mr. Gutstadt to tell him what happened. Instead of believing Ms. Koons, Mr. Gutstadt claimed that she was making it all up and blamed Ms. Koons for the assault.

191.    Around the fall of 2018, Ms. Koons tried to distance herself from Mr. Gutstadt once again. However, he forced his way back into her life by promising her lucrative career opportunities, such as paid writing sessions for the "Trolls" movie and an opportunity to write a song for Chris Stapelton.

192.    During this time, Mr. Gutstadt also took Ms. Koons to an Emmy Awards party hosted by Jay Sures, President of UTA, in Los Angeles to network.

193.    After the party, an entitled Mr. Gutstadt drove Ms. Koons back to his office to have sex.

194.    Mr. Gutstadt made Ms. Koons feel indebted to him for taking her to the Emmy Awards party, so much so that Ms. Koons could not say "no."

195.    This was not consensual sex.

196.    In or around October 2018, Ms. Koons signed a Mutual Non-Disclosure Agreement ("NDA") that, to her knowledge, was not tied to any specific project with Mr. Gutstadt or Ole Music.

197.    At this time, Ms. Koons felt she could trust Mr. Gutstadt and believed that not signing the agreement or questioning it could harm her career.  As a result, she did not consult an attorney before signing the agreement.

198.    After signing the NDA, Mr. Gutstadt warned her that if she ever spoke out, no one would believe her, and that breaching the NDA would not only destroy her career but allow him to ruin her entirely, further silencing and entrapping her.

COMPLAINT

199.    Ole Music, as a party to the NDA, exerted additional control over Ms. Koons by restricting her ability to speak out about Mr. Gutstadt's abuse. This reinforced her fear that breaking her silence would not only result in severe professional consequences but also effectively end her career.

200.    At the same time, the abuse began to escalate significantly.

### iii. **2019 (Financial Control and Physical Abuse)**

201.    It is a well-documented pattern among abusers to escalate their behavior after securing a binding agreement of some sort, such as a marriage license or, in this case, a publishing deal.

202.    On or around April 4, 2019, at Mr. Gutstadt's insistence, Ms. Koons signed a Development Agreement with Jingle Punks/Ole Music,[4] ostensibly to move forward with the creation of a scripted podcast series based on six of her original songs.

203.    However, the agreement severely undervalued her intellectual property and stripped her of significant creative control.

204.    As a joint employer, Ole Music, operating through its executive Mr. Klein, played a pivotal role in overseeing and controlling the terms of Ms. Koons's Development Agreement. By actively directing and influencing the deal, Anthem demonstrated its authority over her professional opportunities and working conditions, solidifying its responsibility as an employer alongside Jingle Punks and Mr. Gutstadt.

205.    While the project was pitched as a collaborative effort, the agreement granted Jingle Punks and Ole Music exclusive rights to shop and develop the series, with Ms. Koons relegated to a consulting role.

---

[4]    Signed by Jason Klein, CEO of Anthem Entertainment.

COMPLAINT

206. Moreover, all creative and business decisions were vested solely in the hands of Jingle Punks and Ole Music, with Ms. Koons granted only limited and non-binding consultation rights.

207. The agreement provided grossly inadequate compensation, tying Ms. Koons's earnings to a small percentage of the budget or minimal per-episode fees, while also requiring the transfer of her intellectual property.

208. Framed by Mr. Gutstadt as standard industry practice, it stripped her of meaningful financial participation and creative control, allowing Jingle Punks and Ole Music, under Mr. Gutstadt's direction, to maintain full authority and further exploit her talent and flourishing career.

209. Later that month, in or around April 2019, the Deutsch Agency reached out to Mr. Gutstadt rather than to Ms. Koons to request her presence at a two-day songwriting session, which took place in Ojai, California.

210. Incredibly, Mr. Gutstadt took most of the money that Ms. Koons earned for this session. When Ms. Koons stood up for herself and demanded a fairer split of the money, Mr. Gutstadt became violent, hitting Ms. Koons, her dog, and breaking her property.

211. This became a common pattern of abuse. Each time Ms. Koons would try to independently further her career, Mr. Gutstadt would resort to physical abuse to maintain his grip over her.

212. The cycle of financial control and professional exploitation persisted in May 2019, when Ms. Koons was coerced into signing a Co-Publishing Agreement, a Copyright Mortgage, and Assignment Agreement (the "Agreements") with Jingle Punks and Ole Music, engineered by Mr. Gutstadt to strip her of creative ownership while allowing Ole Music and its executives,

COMPLAINT

including Mr. Klein, to exercise further control over her intellectual property and career trajectory.

213.    These Agreements granted Ole Music extensive control over Ms. Koons's creative works, including her compositions, copyrights, and financial benefits derived from her intellectual property. These Agreements, in conjunction with Ole Music's partnership with Audio Up, underscores its role as a joint employer. By exercising significant control over Ms. Koons's creative output and its exploitation, Ole Music shared responsibility for her working conditions and contributed to the financial and professional constraints she endured.

214.    Framed as a necessary step to develop a scripted podcast series featuring her original songs, the agreement granted Jingle Punks and Ole Music 50% ownership of her compositions and exclusive rights to modify, monetize, and exploit her music in perpetuity.

215.    In exchange for signing away her creative rights, Ms. Koons received only $10,000—a paltry and insulting amount that grossly undervalued her contributions and highlighted the agreement's exploitative nature.

216.    Stripped of any meaningful creative input, Ms. Koons was effectively sidelined from the project and excluded from benefiting from her own talent.

217.    Compounding this exploitation, Mr. Gutstadt arranged for Ms. Koons to work with Jordan Keller, a music attorney with close ties to Mr. Gutstadt, ensuring that negotiations favored Jingle Punks and Ole Music.

218.    Mr. Gutstadt leveraged Ms. Koons's financial vulnerability and his relationships in the industry to push through a deal designed to enrich Jingle Punks and Ole Music at her expense.

COMPLAINT

219. This agreement exemplifies the calculated and abusive tactics used by Mr. Gutstadt to maintain control over Ms. Koons's career, continuing his relentless exploitation of her work and trust.

220. Then, again in July 2019, Ms. Koons signed an Individual Release Agreement with 5 Alarm Music, a sister company to Jingle Punks and owned by Anthem[5], following a recommendation by Mr. Gutstadt during an Anthem company retreat.

221. The Individual Release is another representation of Ole Music's significant control over her creative contributions.

222. The resulting album, "From Dust Till Dawn," earned Ms. Koons two Production Music Association nominations and has been placed in various films and television shows appearing on Netflix and cable television.

223. However, this contract treated her work as "works made for hire," transferring all ownership and control to 5 Alarm Music in perpetuity.

224. This allowed Anthem unrestricted rights to edit, distribute, and exploit Ms. Koons's music without compensation or her input, leaving her unaware of where and how often her music was placed until they appeared on her American Society of Composers, Authors, and Publishers ("ASCAP") statements.

225. The financial control became so extreme that once Mr. Gutstadt firmly established his grip over Ms. Koons's finances and professional opportunities, the physical violence escalated rapidly, creating an environment of fear and dominance that permeated every aspect of her life.

226. By way of example, in or around October 12, 2019, Mr. Gutstadt and Ms. Koons were in a hotel room in Santa Barbara, California. Needing to know once and for all what truly

_____

[5] On June 6, 2019, Ole Music rebranded to Anthem Entertainment.

COMPLAINT

was going on between Mr. Gutstadt and his wife, Ms. Koons attempted to read their text messages on Mr. Gutstadt's phone.

227.    When Mr. Gutstadt caught her, he violently tackled her to the ground, pinning her wrists to the bed, leaving visible bruises on her arms and hands.

228.    Following the assault, Ms. Koons, visibly shaking, got into an Uber at 2 a.m.

229.    The Uber driver begged Ms. Koons to go to the police but she refused—fearful of what Mr. Gutstadt would do to her if she did.

230.    For a week, Ms. Koons watched her bruises go from bad to worse and no longer recognized her own body. She even had a photo shoot with a photographer with whom she worked with several times, who expressed concern. Ms. Koons downplayed the bruises and came up with an excuse that blamed myself.

231.    Ms. Koons's trauma bond with Mr. Gutstadt, forged through cycles of abuse and manipulation, left her feeling conflicted and unwilling to take actions that might get him in trouble, as he had conditioned her to prioritize his interests over her own well-being.

### iv. **2020 (Hostile Work Environment and Verbal Abuse)**

232.    In January 2022, Mr. Gutstadt founded the Los Angeles-based Audio Up.

233.    On or around March 10, 2020, Ms. Koons signed a Consent to Assignment agreement, transferring her agreements with Jingle Punks to Audio Up.

234.    Notably, Anthem was a party to this agreement, solidifying its role as a joint employer. Anthem maintained its control and involvement in Ms. Koons's employment relationship even after the formation of Audio Up, continuing to exert authority over her professional opportunities and working conditions in conjunction with Audio Up.

COMPLAINT

235.    In or around March 2020, Ms. Koons began working for Audio Up on a scripted podcast series called "Make It Up As We Go" with country music singer Miranda Lambert.[6]

236.    The workplace environment at Audio Up quickly devolved into a hostile and toxic space, as Mr. Gutstadt's behavior set a tone of unchecked misogyny and abuse, emboldening other Audio Up employees to mistreat and demean the women at the company with impunity.

237.    For instance, to highlight just a few examples:

- In or around August 2020, Phil Alberstat, Audio Up's Chief Operating Officer, interrupted a conversation between Ms. Koons and Ashley Arendt, Mr. Gutstadt's Assistant, by handing Ms. Arendt a box of Audio Up merchandise and saying, "take these upstairs, wench." Ms. Koons and Ms. Arendt exchanged looks of disbelief at this blatant misogyny.

- Around the same time, Mr. Alberstat began harassing Ms. Koons about advertisements that should be played on the podcast. In front of Mr. Gutstadt, Mr. Alberstat suggested Ms. Koons find a tampon or "dry vagina cream" company to sponsor the show. Notably, Mr. Gutstadt did nothing to reprimand Mr. Alberstat for blatantly belittling and demeaning Ms. Koons.

- On or around September 8, 2020, Mr. Alberstat berated Ms. Koons for bringing her dog to the studio. Fed up with his demeaning conduct, Ms. Koons sought Mr. Gutstadt's help but rather than address her concerns, Mr. Gutstadt verbally harassed her for having complained about Mr. Alberstat.

238.    Over the next several days, Ms. Koons continued to plead with Mr. Gutstadt, Krista Liney, Creative Director, Jesse Seibenberg, Head of Music Production at Audio Up, and John Ingrassia, President, Music for Podcast Content Production Studio at Audio Up, to remove Mr. Alberstat from her project.

---

[6]    "Make It Up As We Go" was a groundbreaking project for Audio Up, a fledgling company at the time. As such, Ms. Koons was often used as an "example artist" for the Company. Given Ms. Koons's exceptional work on "Make It Up As We Go" (see https://www.cowboysindians.com/2020/11/make-it-up-as-we-go-blends-country-music-and-compelling-drama/ (last visited December 31, 2024)). Ms. Koons was made a shareholder of Audio Up.

COMPLAINT

239.   Given Mr. Gutstadt's refusal to help, Ms. Koons had to take matters into her own hands to keep herself safe.

240.   The next day, September 10, 2020, Ms. Koons emailed Emma Rappold, Podcast Assistant at Audio Up, asking that Mr. Alberstat be removed from communications that included her.

241.   Unsurprisingly, however, Ms. Koons's complaints were never taken seriously, and the harassment persisted.

242.   Around this time, Sloane Logue, Miranda Lambert's agent at the William Morris Endeavor Agency ("WME"), discovered the verbal abuse Ms. Koons was enduring from Mr. Gutstadt and Mr. Alberstat.

243.   Ms. Logue urged Ms. Koons to get away from Mr. Gutstadt, encouraging her to move to Nashville for a fresh start.

244.   Notably, upon information and belief, after learning of the abuse, Miranda Lambert did not participate in writing the season two soundtrack for "Make It Up As We Go," while Mr. Gutstadt was banned from WME's Nashville office.

245.   In November 2020, Ms. Koons moved to Nashville to escape Mr. Gutstadt's abuse.

246.   Because Mr. Gutstadt was deeply entrenched in every aspect of Ms. Koons's life, he wielded his control with constant threats to destroy her career, often using phrases like, "I'll shelve the project."

247.   This control left Ms. Koons feeling as though she owed him an explanation for every move she made, even mundane activities like leaving her house.

248.   While still working with Anthem/Audio Up on the first season of "Make It Up As We Go," she attempted to go on a date with another man in Nashville.

COMPLAINT

249.    Fearful of Mr. Gutstadt's reaction, she told him she was having dinner with a friend and lied that it would be a group gathering to avoid his wrath, even though he himself was still married.

250.    Ms. Koons was so afraid of upsetting Mr. Gutstadt that she refused to let her date pick her up from her home and insisted on splitting the check.

251.    Despite her efforts, Mr. Gutstadt claimed he had her followed, accused her of lying, and berated her for years about this evening.  He repeatedly told her, "I have eyes everywhere, Scarlett."

252.    This incident was just one example of how Mr. Gutstadt weaponized fear and control to destabilize Ms. Koons's reality.

253.    On numerous occasions, he would attack her character and career, accusing her of "using Whiskey Jam to run around and be a whore in Nashville."

254.    He went as far as to threaten to fabricate a lie about her contracting HPV from from her date, claiming he knew someone who had been intimate with him previously and who had the virus.

255.    These abusive tactics, which occurred almost daily for over seven years, caused Ms. Koons to live in a constant state of "fight or flight." The relentless psychological manipulation profoundly affected her mental health and rendered her unable to devise a plan to leave.

256.    Ms. Koons became a prisoner in her own home in Nashville, trapped by the fear and control exerted by a man who was, at the same time, married, engaging in multiple affairs, and hiring escorts.

### v. 2021 (Physical Abuse and Manipulation)

257.    At the same time Ms. Koons was enduring ongoing, visible abuse from him, Mr. Gutstadt continued to be a celebrated figure in the entertainment industry.

33

COMPLAINT

258.    On February 2, 2021, the *Los Angeles Times* highlighted Mr. Gutstadt's leadership at Audio Up and his innovation in creating podcast musicals featuring major artists and original storytelling.[7]

259.    The article opened with the line, "Before her podcast, Scarlett Burke says she was a 'nobody,'" a false narrative that was pushed by Mr. Gutstadt and his team and exemplified his abusive tactics. This portrayal, far from reflecting Ms. Koons' reality as a proud and accomplished artist, echoed his pattern of tearing her down and misrepresenting her work to diminish her value while bolstering his own public image.

260.    This public facade of success starkly contrasted with his reprehensible behavior taking place behind closed doors.

261.    In the spring of 2021, Mr. Gutstadt chased Ms. Koons around the second floor of the Audio Up studio, tackling her to the ground as she held his cellphone.

262.    Ms. Koons began screaming at him to get off her, but that only made him more enraged, as he pinned her arms to the ground.

263.    Ms. Koons, realizing that Gladys, Audio Up's office custodian, was at the office, began screaming, "stop, Gladys is here!"

264.    Once Mr. Gutstadt realized that someone might witness his violence, he snatched his phone out of Ms. Koons's hand and got up.

265.    Following this incident, Ms. Koons told Mr. Gutstadt to never touch her again.

266.    With chilling arrogance, Mr. Gutstadt callously declared that no one would ever believe her if she dared to speak out against him.

---

[7]    See    https://www.latimes.com/entertainment-arts/business/story/2021-02-02/audio-up-media-jared-gutstadt-podcast-musicals (last visited December 31, 2024).

COMPLAINT

267.    Although Ms. Koons desperately wanted to dismiss his words as empty threats, she was painfully aware that he still wielded immense power over her career and its trajectory, leaving her trapped in silence.

268.    This was especially true around this time, as Machine Gun Kelly had recently released "Love Race," a song he co-wrote with Mr. Gutstadt and Jeff Peters, further exemplifying his power in the industry and over her career.

269.    Every time Ms. Koons tried to distance herself from Mr. Gutstadt, his jealousy and violence towards her escalated.

270.    On numerous occasions, he accused Ms. Koons of engaging in prostitution and receiving Venmo payments from men—a false and abusive accusation.

271.    On April 21, 2021, Mr. Gutstadt flew Ms. Koons to Audio Up's Audio Chateau in Los Angeles, California to perform for investors.

272.    After her performance, Ms. Koons posted a video of her performance on social media.

273.    This enraged Mr. Gutstadt, who had lied to his wife about firing Ms. Koons and feared her finding out that the two of them had been together in Los Angeles.

274.    True to his manipulative and abusive form, Mr. Gutstadt called Ms. Koons a "psycho" and threatened to "kill himself" because of her social media post.

275.    Around this time, Ms. Koons tried again to block Mr. Gutstadt due to his persistent harassment, but Mr. Gutstadt continued to find alternative ways to contact Ms. Koons—such as direct messaging her on Instagram.

276.    While in Miami in June 2021, Ms. Koons accessed Mr. Gutstadt's phone to confirm her suspicions of his deceit and infidelity.

COMPLAINT

277.    Her discoveries revealed disturbing messages, including conversations with a woman identified as "Kas," suggesting that Mr. Gutstadt had been soliciting escorts.[8]

278.    When confronted, Mr. Gutstadt again became physically violent, wrestling the phone from Ms. Koons's hands.

279.    Mr. Gutstadt later retaliated against Ms. Koons by sending a humiliating text message that he wrote from her phone to a colleague.

280.    He then escalated his aggression by throwing a fruit platter across their hotel room, leaving Ms. Koons surrounded by shattered plate fragments.

281.    At the height of Audio Up's dominance in the industry, fueled by a $12 million investment[9] from Reservoir and SiriusXM, Mr. Gutstadt wielded immense power and influence, both as the Company's leader and as a celebrated figure in entertainment. This unchecked authority enabled him to maintain control over those around him, including Ms. Koons, despite his escalating abusive behavior.

282.    On November 10, 2021, while she was hospitalized with COVID-19, Ms. Koons was scheduled to record a voice-over session with a male actor whom she had previously praised in a press interview.

---

[8]     Two years later, on September 28, 2023, Ms. Koons contacted Kas, seeking validation of her longstanding suspicions. In a candid conversation, Kas disclosed that in April 2021, at the behest of Mr. Gutstadt, she had arranged for an escort to join him and his investors during a night out in Miami. These revelations were corroborated by screenshots and messages shared by Kas and another woman, detailing how Mr. Gutstadt lured women to Audio Up investor dinners under false pretenses. In his text messages to Kas, Mr. Gutstadt wrote, "She better be ready to marry[.] I need more kids." When confronted, Mr. Gutstadt attempted to discredit Kas, alleging mental instability and fabricating stories to deflect blame.

        After being confronted with this undeniable evidence, Mr. Gutstadt manipulated the situation further to deflect from his own actions, and contacted Ms. Koons's family to falsely insinuate that she had harmed herself, causing immense distress to her loved ones who were already strained by a family health crisis involving her mother. This calculated deflection underscored the depths of Mr. Gutstadt's manipulation and the lengths to which he was willing to go to maintain control over Ms. Koons.

[9]     See https://www.digitalmusicnews.com/2021/10/14/reservoir-siriusxm-audio-up-investments/ (last visited December 31, 2024).

36

COMPLAINT

283.    This triggered Mr. Gutstadt's jealousy, leading him to attempt to sabotage the recording session by directing Zach Selwyn, an actor on "Make It Up As We Go," to take over Ms. Koons's role as Director.

284.    Around this time, Ms. Koons told Mr. Gutstadt that she wanted to try and pursue opportunities outside of Audio Up.

285.    However, once Ms. Koons began taking meetings with other publishing companies, Mr. Gutstadt began sending Ms. Koons threatening messaging.

286.    Mr. Gutstadt claimed that he had created opportunities for Ms. Koons and began to scare her into staying at Audio Up, telling her that she had "fiduciary duties."

287.    On December 3, 2021, an Audio Up producer gave Ms. Koons the demo of a song she co-wrote with artists Johnny McGuire and Phil Bogard, but with an artist named Garrett Hedlund's voice.

288.    Ms. Koons had sent the song to Mr. Gutstadt months prior in confidence, and never imagined that he would go and record the song with Mr. Hedlund without her knowledge or permission.

289.    Ms. Koons contacted Mr. Ingrassia to report Mr. Gutstadt for stealing her song.

290.    Ms. Koons also contacted Mr. Hedlund.

291.    Immediately, Mr. Gutstadt accused Ms. Koons of "harassing" Mr. Hedlund, and sent her numerous threatening text messages.

292.    Mr. Gutstadt demeaningly wrote, "Good news tho Universal is not interested in your deal…Get a job at hooters."

293.    Ms. Koons was supposed to perform at the Audio Up holiday show that year but after receiving these threatening messages, dropped out of the event.

COMPLAINT

294.    Over the next few days, Mr. Gutstadt relentlessly called, direct messaged, and texted Ms. Koons.

295.    When his initial efforts failed, Mr. Gutstadt enlisted Mr. Ingrassia to call Ms. Koons and attempt to persuade her to perform at the event with flattery, insisting that performing was "in her best interest."

296.    In reality, this was a desperate, last-ditch effort to salvage Audio Up's reputation with its investors, as having a signed artist back out at the last minute would appear highly unprofessional.

297.    Mr. Gutstadt repeatedly texted Ms. Koons, telling her that "fragility is not a trait [o]f successful people," in an attempt to diminish his abuse and gaslight Ms. Koons for standing up for herself.

298.    When Ms. Koons did not acquiesce to his demands, Mr. Gutstadt, like many abusers, resorted to "love bombing"—a manipulative tactic used to regain control over their victims.

### vi. <u>2022 (Rape)</u>

299.    Mr. Gutstadt's treatment of Ms. Koons as purely a sex object escalated significantly and shockingly in 2022.

300.    In or around January 2022, Mr. Gutstadt flew Ms. Koons to the Audio Chateau in Los Angeles to record two songs with him and a songwriter named Liz Rose.

301.    During that trip, Ms. Koons woke up in the middle of the night after feeling something heavy on top of her.

302.    She opened her eyes and saw that it was Mr. Gutstadt on top of her, raping her in her sleep.

COMPLAINT

303.    When Ms. Koons realized what was happening, she froze, and stared at the ceiling until Mr. Gutstadt finished, fearful of what more he could do to her if she tried to stop him.

304.    When Mr. Gutstadt was finished, Ms. Koons got up and went to the bathroom and attempted to confront Mr. Gutstadt and tell him that it was not okay to have sex with her while she was asleep.

305.    Mr. Gutstadt responded, "Oh shut up, Scarlett. Nobody raped you."

306.    At that moment, Ms. Koons realized that Mr. Gutstadt would stop at nothing to protect himself and felt entitled to Ms. Koons's body at any moment.

307.    This chilling realization left her fearful of the potential consequences of confronting him again, as he had already made it clear that he would go to any lengths to silence and discredit her.

308.    On February 23, 2022, Ms. Koons tried again to end her relationship with Mr. Gutstadt. In response, Mr. Gutstadt incessantly called and texted Ms. Koons, and when she did not answer, called her friends and family.

309.    He even tracked Ms. Koons's whereabouts by reviewing the Ring camera footage at Audio Up's Audio Chateau in Nashville where Ms. Koons was a rent-paying tenant, under the ridiculous pretense of not wanting Ms. Koons to "bring home some guy" who would "steal company property."

310.    On one occasion, Mr. Gutstadt even called Ms. Koons's neighbor and the Audio Chateau's groundskeeper to try to get in contact with her.

311.    To distance herself from Mr. Gutstadt and Audio Up, the next day, February 24, 2022, Ms. Koons canceled a panel appearance at the South by Southwest ("SXSW") event.

COMPLAINT

312.    During a Facetime call, Mr. Gutstadt became so enraged at Ms. Koons for dropping out of the panel that he punched a hole through the second-floor window at Audio Up's offices, shattering the glass.

313.    The next morning, Mr. Gutstadt flew to Nashville and appeared unannounced on Ms. Koons's doorstep.

314.    Despite Ms. Koons's pleas for him to leave, he refused, becoming violent by hitting Ms. Koons and breaking her property.

315.    Seeing the extreme measures which Mr. Gutstadt took to keep his tight control over Ms. Koons, and having experienced the repercussions of rejecting his demands, Ms. Koons acquiesced to going to SXSW with Mr. Gutstadt, but requested to have her own room there.

316.    Despite forcing her to attend, Mr. Gutstadt told Ms. Koons that there was supposedly not enough money in the Audio Up budget to pay for Ms. Koons to have her own room, despite Audio Up paying for country music singer, Abby Anderson and Ms. Rose to have their own rooms.

317.    Once again, Ms. Koons was forced into sharing a room with Mr. Gutstadt.[10]

318.    At SXSW, when Ms. Koons refused to have sex with Mr. Gutstadt, he resorted to insults, telling her that he no longer liked how she looked naked.

319.    Immediately following Mr. Gutstadt's tirade of insults, Mr. Gutstadt presented Ms. Koons with flowers in front of her colleagues.

320.    Again, this was a clear tactic to "love bomb" Ms. Koons and make himself out to look like the good boyfriend.

321.    In or around March 2022, Mr. Ingrassia resigned from his position at Audio Up.

---

[10]    Notably, when Ms. Koons and Mr. Gutstadt would travel together, Mr. Gutstadt consistently flew first class while relegating Ms. Koons to coach. He would dismissively joke that allowing her to fly first class might raise suspicions with the accounting department. However, upon reaching their destination, Ms. Koons was forced to share a hotel room with Mr. Gutstadt.

40

COMPLAINT

322.   Following his resignation, Audio Up initiated an internal investigation conducted by Keller Turner Andrews & Ghanem, PLLC, after Mr. Ingrassia threatened to sue the company for creating a hostile work environment.

323.   As part of this investigation, Ms. Koons was asked to provide a written statement.

324.   Before she could prepare her statement, however, she received a call from Mr. Gutstadt and Mr. Alberstat.

325.   During the call, Mr. Gutstadt claimed that Mr. Ingrassia was "slandering" her, alleging that she had acted inappropriately during Zoom calls.

326.   These allegations were entirely false, but at the time, Ms. Koons believed him.

327.   During the conversation, Mr. Gutstadt asked her pointedly, "So when you talk to the investigator, are you an employee of Audio Up?" to which she replied, "Yes."

328.   He repeated the question, prompting her to clarify, "Well, I'm not on salary."

329.   When he pressed her again, it became clear he was attempting to influence her response, ultimately pressuring her into a lie and say she was not an employee.

330.   Afterward, the law firm of Gorden Rees Scully Mansukhani, LLP ("GRSM") took over as counsel for Audio Up.

331.   When writing her statement for Audio Up's counsel, Ms. Koons felt coerced into using language dictated by Mr. Gutstadt, and feared that failing to comply would result in further harassment from him.

332.   However, after submitting the statement, Ms. Koons felt uneasy about not having told the truth. This discomfort led her to reach out to Kimberly Westmoreland, a partner at GRSM, to request revisions to her statement.

COMPLAINT

333.    Given the scope of the investigation and the allegations brought forward, it is evident that Anthem was, or should have been, aware of the pervasive mistreatment and hostile work environment at Audio Up.

334.    Despite this knowledge, Anthem failed to take any meaningful steps to address or prevent the abusive conduct, allowing the toxic culture to persist unchecked.

335.    Anthem's inaction enabled the continuation of a workplace where harassment and coercion were not only tolerated but reinforced by leadership, further solidifying its complicity in the ongoing mistreatment of employees, including Ms. Koons.

336.    When Ms. Koons got back to Nashville, she attempted to block Mr. Gutstadt's phone number once again. However, he reached out to her via Instagram to apologize.

337.    On July 17, 2022, Ms. Koons attended an Audio Up writing retreat at Center Hill Lake.  Unfortunately, Mr. Gutstadt was also in attendance. Ms. Koons tried her best to avoid Mr. Gutstadt.

338.    However, on the first night of the retreat, Mr. Gutstadt became enraged at Ms. Koons for refusing to have sex with him. He told Ms. Koons that she was "ruining his vacation," and coerced her into having sex with him again.

339.    Ms. Koons knew better this time than to confront Mr. Gutstadt—fearful of the lengths he would go to hurt her.

340.    Ms. Koons wished to have spent this time connecting with the other songwriters and artists and work on her music rather than worry about placating Mr. Gutstadt's sexual desires for fear of the fallout from refusing his demands.

COMPLAINT

341.   The next day, songwriter Jake Puliti walked in on Mr. Gutstadt berating Ms. Koons, leaving her completely humiliated and exposed in a moment that underscored the abusive power dynamics to which she was beholden.[11]

### vii. **2023 (Physical, Verbal, and Sexual Abuse)**

342.   In 2023, the abuse horrifyingly intensified.

343.   On January 27, 2023, Ms. Koons and Mr. Gutstadt stayed at the Aspen, Colorado home of Ben Silverman, a prominent media executive and Executive Producer of "The Office."

344.   At dinner, Ms. Koons asked Mr. Gutstadt about turning the "Make It Up As We Go" podcast into a television series, which had been a promise Mr. Gutstadt made to Ms. Koons at the inception of the podcast.

345.   Mr. Gutstadt became enraged, causing a scene at the restaurant.

346.   When the two went back to the house, Mr. Gutstadt grabbed Ms. Koons's legs and attempted to rape her again.

347.   When Ms. Koons fought back, Mr. Gutstadt said, "We're a couple. We're on vacation and when couples are on vacation they are supposed to fuck, eat, drink and sleep in the same bed and tonight we are fucking."

348.   Ms. Koons warned him that if he tried to touch her again, she would call the police.

349.   For the remainder of the trip, Mr. Gutstadt publicly berated Ms. Koons for not having sex with him.

350.   On February 14, 2023, Mr. Gutstadt flew Ms. Koons to the Audio Chateau in Los Angeles for Valentine's Day. Mr. Gutstadt gifted Ms. Koons lingerie, but when the lingerie did not fit her, he got so angry he ripped the curtain rods off the wall and bent the rod in half.

---

[11]   Earlier this year, Ms. Koons ran into Mr. Pulitti who expressed relief when he learned that Ms. Koons was no longer in a relationship with Mr. Gutstadt.

COMPLAINT

351.    Ms. Koons told Mr. Gutstadt that she did not want to have sex with him because she was on her period, but Mr. Gutstadt did not believe her and made her show him her tampon string.

352.    Fearful of his escalating temper, Ms. Koons slept in a different room from Mr. Gutstadt that night.

353.    On other occasions, Ms. Koons would barricade herself in a guest bedroom at both of Audio Up's Audio Chateaus in Los Angeles, California and Nashville, Tennessee, to escape from Mr. Gutstadt.

354.    In a drunken rampage, Mr. Gutstadt would break through the barricade and pick the lock to the door to get to Ms. Koons.

355.    The abuse caused Ms. Koons to suffer from severe anxiety and depression.

356.    In or around February 2023, Ms. Koons started visiting a therapist to come up with a plan to escape her abusive relationship with Mr. Gutstadt once and for all.

357.    Simultaneously, Mr. Gutstadt convinced Ms. Koons to attend couple's therapy sessions with him as a way to manipulate her into staying with him.

358.    Around August 2023, Mr. Gutstadt collaborated with rapper Lil Wayne on the theme song for "Undisputed," a daily sports talk show.

359.    This collaboration further solidified Mr. Gutstadt's status as a major power player in the entertainment industry. Partnering with one of the most iconic names in hip-hop on such a high-profile project showcased Mr. Gutstadt's far-reaching influence.

360.    While Mr. Gutstadt's career achievements were making headlines, his unchecked abuse inflicted upon Ms. Koons continued to unfold.

COMPLAINT

361.   In August 2023, Ms. Koons discovered that Mr. Gutstadt's divorce was not final when she overheard his mother on the phone asking, "Jared, when will your divorce be final with Corrine?"

362.   Following the call, in his typical manipulative fashion, Mr. Gutstadt attempted to discredit even his own mother, dismissing her as old and senile and accusing her of "sniffing glue."

363.   This revelation about the true status of Mr. Gutstadt's marriage shattered Ms. Koons's already fragile sense of reality, as it became clear that he had been lying to her once again.

364.   Determined to uncover the full extent of his deceit—both personally and professionally—Ms. Koons began to dig deeper into his fabrications.

365.   In September 2023, Mr. Gutstadt's abuse towards Ms. Koons escalated further and she became desperate to get out of the relationship.

366.   During the week of September 11, 2023, Ms. Koons began reviewing her ASCAP fee splits.

367.   For the prior seven years, she had been working without a manager because Mr. Gutstadt refused to allow her to have one.

368.   As she examined the splits on a Christmas song she had recorded named "Howdy Christmas," Ms. Koons quickly identified discrepancies and began asking Mr. Gutstadt for clarification on who owned the master and who received payments when the song was licensed to the Tanya Tucker Christmas movie, "A Nashville Country Christmas."

369.   Her inquiry infuriated Mr. Gutstadt, triggering a week of intense hostility, leaving Ms. Koons in an increasingly unsafe and terrifying situation.

COMPLAINT

370. On September 12, 2023, when Ms. Koons questioned Mr. Gutstadt about royalties she believed had been wrongfully withheld, his rage escalated. He stormed into a closet at the Audio Chateau in Los Angeles, retrieved handfuls of cash, and aggressively threw them at Ms. Koons, screaming, "Here's your missing royalties, Scarlett."

371. On September 13, 2023, after enduring one of Mr. Gutstadt's drunken rampages the night prior, Ms. Koons barricaded herself in a guest bedroom.

372. This further enraged Mr. Gutstadt, who began to pick the lock to the bedroom.

373. Ms. Koons, fearing for her life, told Mr. Gutstadt that she called the police in a desperate attempt to de-escalate the situation and save her from physical harm.

374. Unfortunately, this statement only made the situation more dangerous as the severely intoxicated Mr. Gutstadt got into a truck to drive over to his sister's home.

375. Ms. Koons, fearing for Mr. Gutstadt's safety and that of others on the road, assured Mr. Gutstadt that she had not called the police and urged him to return home.

376. The next day, September 14, 2023, during Audio Up's weekly "Pub Call" in which Audio Up songwriters discuss what Mr. Gutstadt wanted them to focus on, Mr. Gutstadt became incensed that an upcoming writing retreat had apparently not been planned to his liking and dropped off the call.

377. Ms. Koons, who was in a different part of the Audio Chateau, heard a loud crash and realized that Mr. Gutstadt had thrown a wooden desk over the side of the house.

378. When Mr. Gutstadt made eye contact with Ms. Koons, he clenched his fists and viciously charged at her.

379. Thankfully, Jimmy Jellinek, Chief Creative Office, was able to prevent Mr. Gutstadt from hurting Ms. Koons.

380.  That night, and into the next morning, Mr. Gutstadt's rampage continued, as he indiscriminately threw and broke bottles of wine, wine glasses, and other fragile items throughout the house.

381.  On that same evening, Mr. Gutstadt and Ms. Koons attended a performance by Abby Andersson.

382.  When she and Mr. Gutstadt returned to the Audio Chateau, Ms. Koons told Mr. Gutstadt that she was "inspired" by Ms. Anderson and wanted to develop her own identity in the music industry.

383.  Immediately, Mr. Gutstadt began screaming at Ms. Koons, telling her to "stop complaining."

384.  Mr. Gutstadt then charged at Ms. Koons, grabbed a wine glass out of her hand, and threw the glass across the room.

385.  He then continued to break nearly everything in sight.

386.  An extremely frightened Ms. Koons called Ms. Anderson for help. Ms. Anderson could hear the glass shattering in the background and urged Ms. Koons to "get out of there" and go stay at the home of Will Ward, an Audio Up Investor and Ms. Anderson's former manager.

387.  Ms. Koons was terrified to leave the Audio Chateau, fearing that doing so would enrage Mr. Gutstadt enough to kill her.

388.  As she drove to Mr. Ward's house, Mr. Gutstadt threatened to call the police on Ms. Koons for "stealing" the company truck.

389.  Once Ms. Koons got to Mr. Ward's house, Mr. Gutstadt sent Ms. Koons a video of all the broken glass he caused, narrating the video as if Ms. Koons had created the damage. Mr. Gutstadt circulated this video to several people, including her family.

COMPLAINT

390.    Ms. Koons did not know what to do, so she texted Mr. Jellinek asking for help. He responded, "What's going on[.] [A]re you safe?"

391.    Ms. Koons also texted Mr. Gutstadt's brother, David, asking for help. She received no response.

392.    Every person in a position of power or authority at or with Audio Up, including investors and Anthem as a joint employer, was well aware of Mr. Gutstadt's unlawful treatment of Ms. Koons, as his abusive and manipulative behavior was pervasive and widely observed within the company.

393.    This collective awareness, combined with Anthem's failure to intervene or take meaningful corrective action, highlights a culture of complicity and gross negligence, enabling the continuation of such unlawful conduct.

394.    With her career still in Mr. Gutstadt's grasp, Ms. Koons went back to Mr. Gutstadt on September 15, 2023.

395.    Unfortunately, that night would mimic the same way their relationship first started in 2017 — with a non-consensual sexual encounter.

396.    That night, Mr. Gutstadt and Ms. Koons stayed at the Langham Hotel in Pasadena, California ahead of Audio Up's writing retreat.

397.    In their hotel room, Mr. Gutstadt launched into yet another tirade when Ms. Koons refused his sexual advances, explaining that she felt unwell and might be coming down with something.

398.    Her explanation did little to deter him, as he continued to berate her, cruelly referencing their last sexual encounter and expressing his dissatisfaction.

399.    With utter contempt, he degraded her further by saying, "Fucking you is like fucking a dead starfish."

COMPLAINT

48

400.    That night, Mr. Gutstadt again raped Ms. Koons.

401.    As he raped her, Ms. Koons looked away, focusing on a spot on the wall and praying for it to end.

402.    After Mr. Gutstadt raped Ms. Koons, the two of them went to dinner in Pasadena, California.

403.    At the restaurant, Ms. Koons told Mr. Gutstadt that she was not feeling well and he became angry and quickly asked for the check.

404.    During the Uber ride home, Mr. Gutstadt mocked and belittled Ms. Koons for not feeling well—repeating everything Ms. Koons said in a mocking tone.

405.    In the middle of the night, Mr. Gutstadt stormed out of the hotel room, but not before taking a swig of his drink and hurling the glass across the room in Ms. Koons's direction.

406.    As he left, he spat out a vicious insult, saying, "I'm sorry your parents never wanted you, you fucking cunt."

407.    Ms. Koons felt relieved once Mr. Gutstadt left, but almost immediately, Mr. Gutstadt began rage texting Ms. Koons, threatening to contact her family.

408.    The next day, Ms. Koons returned to the Audio Chateau to pack her belongings.

409.    As she attempted to gather her things, Mr. Gutstadt began screaming at her, shouting, "Get the fuck out of this house."

410.    When Ms. Koons expressed her desire to stay for the writing retreat that Audio Up—her publisher—was hosting in collaboration with Universal—an event she had every right to attend as a signed artist—he erupted again.

411.    Mocking her work, he sneered, "Scarlett, no one gives a shit about songs from your diary." "Get the fuck out of this house." "You're not staying for the retreat."

COMPLAINT

412.   Afraid to involve the police, Ms. Koons called her mother and kept her on speakerphone. Her mother could hear Mr. Gutstadt screaming and hurling objects.

413.   Although her mother wanted to call the police, Ms. Koons feared what he might do if law enforcement became involved. Instead, her mother sent her a link to a nearby domestic violence shelter in Brentwood, California.

414.   While packing in a closet, Ms. Koons found herself physically blocked by Mr. Gutstadt, who began berating her family.

415.   Desperate to get out, she pushed him aside.

416.   Mr. Gutstadt paused for a moment before shoving her with such force that she fell backward, tripping over her suitcase, and hitting the desk at the back of the closet.

417.   Terrified, but resolute, Ms. Koons warned him that if he touched her again, she would call the police. She hurriedly finished packing and left.

418.   In the aftermath, Mr. Gutstadt immediately began a smear campaign to discredit her in case she spoke out about the incident.

419.   He barred Ms. Koons from attending the Country Music Awards ("CMA") Party at the Audio Up house in Nashville, where she was still paying rent.  He also excluded Ms. Koons from writing sessions, and told a colleague at another publishing company that she was beyond help and severely mentally ill.

420.   These actions were part of a calculated effort to silence Ms. Koons and tarnish her reputation in case she ever revealed the abuse and torment Mr. Gutstadt had put her through.

### C.   Mr. Gutstadt Retaliates Against Ms. Koons by Ousting Her From Audio Up

421.   On September 29, 2023, Hunter Elizabeth, an artist and a friend of Ms. Koons, told Ms. Koons that Mr. Gutstadt had been spreading rumors that Ms. Koons was harassing his family and employees.

COMPLAINT

422.    When Ms. Koons confronted Mr. Gutstadt, he reacted as abusers often do—by gaslighting her.

423.    On October 1, 2023, he bombarded her with a flurry of text messages in an attempt to downplay his harassment from the previous day.

424.    Among his messages, he wrote, "Despite what you think, I still care about you and want you to succeed more than anybody in the world."

425.    He then sent photos of the two of them lying in bed, accompanied by captions such as, "Ya—I guess I was some lying monster" and "I'm some asshole," in an effort to manipulate and guilt her further.

426.    On October 13, 2023, Audio Up released an article promoting a new series named "Montana Mavericks."

427.    Although Ms. Koons had contributed several songs to the project and even played the role of "Brittany" in the series, she was inexplicably excluded from the article, even though every other contributor was identified.[12]

428.    That same day, during a writing session with artist Clayton Johnston and Ms. Anderson at the Audio Chateau in Nashville, Tennessee, Mr. Gutstadt began repeatedly calling Ms. Koons's phone.

429.    When Ms. Koons refused to pick up her phone, Mr. Gutstadt flooded Ms. Koons's phone with text messages.

430.    Mr. Gutstadt then called Mr. Johnston to ask whether Ms. Koons was badmouthing him.

---

[12]    *See* Harlequin & Audio Up To Adapt Books As Podcasts With Montana Mavericks (last visited December 31, 2024).

COMPLAINT

431.   Mr. Gutstadt's disruptive behavior impeded the writing session and the song the group was working was never completed.

432.   Tellingly, this was also the last time Ms. Koons was invited to be a part of an Audio Up writing session.

433.   In or around October 2023, Mr. Gutstadt began stalking Ms. Koons.

434.   Mr. Gutstadt became obsessive over Ms. Koons's dating life and relationships, which only led to more harassment.

435.   Below are just a few of the many examples of the ways in which he stalked her:

- On October 17, 2023, Mr. Gutstadt sent Ms. Koons an incessant number of text messages asking her if she had set up her "Raya" dating profile yet or if she was going to use the dating app Hinge because "apparently that's the one just for hookups." Hours later, after sending Ms. Koons over 20 texts to which she did not respond, Mr. Gutstadt texted Ms. Koons, "I[']m sorry about earlier."

- Mr. Gutstadt began contacting Ms. Koons's friends and colleagues to figure out Ms. Koons's whereabouts. Through doing this, he learned that Ms. Koons was going on a date and began to harass Ms. Koons.

- On October 19, 2023, Mr. Gutstadt began using security cameras to monitor Ms. Koons's whereabouts within the Nashville Audio Chateau.

- On October 24, 2023, Mr. Gutstadt let Ms. Koons borrow the company truck. However, unbeknownst to Ms. Koons, Mr. Gutstadt used a tracking app to stalk Ms. Koons. Notably, Ms. Koons went to WME for a meeting that day that she had not disclosed to Mr. Gutstadt. Later that day, Mr. Gutstadt emailed her indicating that he knew about the meeting.

- On October 28, 2023, Ms. Koons was at Audio Up's Nashville location. Throughout that night, Mr. Gutstadt emailed Ms. Koons, who had decided to dress up that evening, with the subject line "How was it?"  Upon information and belief, Mr. Gutstadt used the security cameras to track Ms. Koons's whereabouts that night.

436.   Beyond stalking her, Mr. Gutstadt continued to leverage his power and influence to oust Ms. Koons from Audio Up and tarnish her career.

COMPLAINT

437.   On October 23, 2023, Ms. Koons asked Mr. Gutstadt to be put back onto the "Pub Club" group text.

438.   Ms. Koons wanted to be added back in so that she could collaborate with her fellow artists and continue to be included in projects.

439.   This enraged Mr. Gutstadt who told Ms. Koons that he was discontinuing the group text and that "everyone is on their own to find writing ops...."

440.   Later that day, Mr. Gutstadt informed Ms. Koons that she was not allowed into the Audio Chateau South—despite it being her home and for which she had paid over $20,000 in rent—while he hosted a writing camp, which was an event to which Ms. Koons would have previously been invited.

441.   Despite explaining to him that she had no other place to stay, Mr. Gutstadt insisted: "No-that[']s not on the table-you are not staying in the house when I[']m there."

442.   Consequently, Ms. Koons had to leave the house during the writing session for other reasons, causing her to miss the chance to collaborate with artists like Abby Anderson and Bonnie Dymond.

443.   Notably, Abby Anderson recorded a song with artists Diplo and Anella Herim that was generated at these sessions.

444.   On November 1, 2023, while Ms. Koons was trying to coordinate her move-out of the Audio Chateau South, Joe Coombs, Audio Up's CFO, told Ms. Koons that Audio Up would not be paying Ms. Koons the executive producer fee that she was owed from "Once Removed," Ms. Koons's brother-in-law's project that she brought to Mr. Gutstadt's attention in 2022.

445.   Audio Up later sold "Once Removed" to Audible Inc. for six figures, but only gave Ms. Koons $5,000 from the deal and told her that the rest was going to supposedly pay her rent at the Audio Chateau, even though there had never been a formal rental agreement.

COMPLAINT

446.    On November 1, 2023, in a transparent attempt to harm Ms. Koons, Mr. Gutstadt texted her, "I've been advised by **the board** to stop doing favors for my GF" (emphasis added).

447.    This statement leaves no doubt that the entire Audio Up Board of Directors was not only aware of the abusive relationship between Mr. Gutstadt and Ms. Koons, but was actively advising him on it.

448.    The involvement of the entire Audio Up Board makes any claim of ignorance by Anthem implausible. In fact, Anthem has recently established a new publishing joint venture with Mr. Gutstadt.[13]

449.    On November 5, 2023, Mr. Gutstadt hosted another major Audio Up event at the Audio Chateau, where Ms. Koons was still residing.

450.    This important industry gathering included all the songwriters with whom Ms. Koons had previously collaborated during her work with Audio Up.

451.    Mr. Gutstadt forbid Ms. Koons from attending the event, excluding her from a valuable networking opportunity and further harming her career.

452.    Although Mr. Gutstadt barred Ms. Koons from attending these events, he refused to loosen his grip and let her live free from his control.

453.    From November 6, 2023, to November 9, 2023, Mr. Gutstadt relentlessly bombarded Ms. Koons with text messages demanding to know if she was with another man.

454.    In a disturbing display of aggression and jealousy, he sent her a text that read, "I'm sick to my stomach seeing you flirt with that 5'5 midget fuck face," showcasing his relentless efforts to humiliate and emotionally manipulate her.

---

[13]    *See*    https://musicrow.com/2024/06/anthem-entertainment-audio-up-establish-new-publishing-joint-venture-exclusive/ (last visited December 31, 2024).

COMPLAINT

455.    The next day, after Ms. Koons did not respond, Mr. Gutstadt sent a screenshot of an Instagram profile of Zachary Todd's Instagram profile with the message, "This guy? Your type like Garrett and your junkie fuck head ex[.] LOL[.] Have fun[.] Coward[.]"

456.    After a few hours of insults, Mr. Gutstadt demanded Ms. Koons get on the phone with him for a "proper goodbye."

457.    The next day, November 9, 2023, Mr. Gutstadt hosted Nick Barr, Senior Vice President of Pulse Records, and Maddox, a Pulse Records Artist, at the Audio Chateau for a writing session.

458.    Ms. Koons requested to participate in these sessions, but Mr. Gutstadt flat out rejected her request, while permitting Clayton Johnston, another Audio Up songwriter, to attend.

459.    Ms. Koons was relegated to the role of "studio greeter," and Mr. Barr was unaware that she too was a songwriter.

460.    Mr. Johnston ultimately secured an appearance on Maddox's record as a result of these writing sessions, highlighting another lost career advancement opportunity for Ms. Koons due to Mr. Gutstadt's retaliatory actions.

461.    Mr. Gutstadt's controlling behavior became so severe that he would not even allow Ms. Koons to stop by the Audio Chateau without becoming irate.

462.    For instance, on December 3, 2023, Ms. Koons dropped by the Audio Chateau to pick up some of her belongings.

463.    However, once she left, she received multiple messages from Mr. Gutstadt chastising her for having gone there.

464.    By contrast, every other Audio Up songwriter was free to visit the Audio Chateau whenever they wanted, without any backlash.

COMPLAINT

465.    On December 4, 2023, Ms. Koons complained to Mr. Gutstadt about not receiving the same career opportunities as other Audio Up songwriters.

466.    In a text message following their call, Mr. Gutstadt wrote: "I will stop trying to help if you keep acting like this."

467.    Mr. Gutstadt was referring to Ms. Koons's attempt at standing up for herself against his abusive and retaliatory treatment.

468.    Ms. Koons's request for equal treatment seemed to infuriate Mr. Gutstadt, while other songwriters did not face such hostility for seeking out opportunities.

469.    On December 5, 2024, despite harassing Ms. Koons the day prior, Mr. Gutstadt sent Ms. Koons text messages telling her that he was "proud" about the announcement of a record label partnership with Virgin Music Group[14] and that he "always [] go[es] out of [his] way to credit [Ms. Koons and Mr. Gutstadt's] projects."

470.    This was a completely hollow statement given that Ms. Koons was neither paid or given credit for this project.

### i. 2024 (Defamation and Retaliation)

471.    On January 4, 2024, Mr. Gutstadt sent Ms. Koons a text message informing her that some of the songs she had worked on at Audio Up were set to be released in 2024.

472.    While framed as "encouragement," this message highlighted the ongoing exploitation of Ms. Koons's creative work.

473.    Notably, these songs never came out and Mr. Gutstadt wrote new music in an effort to keep Ms. Koons's out.

---

[14]    *See* https://www.billboard.com/business/record-labels/audio-chateau-records-launch-virgin-music-group-partnership-1235534074/ (last visited December 31, 2024). Notably, Ms. Koons's name is not mentioned once in this article, despite it being her project.

COMPLAINT

474.    On or around January 18, 2024, Audible Sleep and Audio Up released *Sound Therapy: Sleep*, narrated by Ms. Koons.[15]

475.    Upon information and belief, Audio Up sold Ms. Koons's likeness to Audible for six-figures, while Ms. Koons herself received only $750 from Mr. Gutstadt.

476.    Under false pretense, Mr. Gutstadt reprehensibly manipulated Ms. Koons into recording voiceovers, which were then used to train artificial intelligence to replicate her voice without her knowledge or consent.

477.    On January 22, 2024, Ms. Koons texted Mr. Gutstadt to inquire about payment for her work on "Once Removed."

478.    In response, Mr. Gutstadt informed her that she would only be paid $250—a paltry and insulting amount considering the time, effort, and creativity she had invested.

479.    This demeaning offer underscored the continued pattern of devaluing Ms. Koons's contributions while exploiting her talents for Audio Up's benefit.

480.    On or around January 26, 2024, the artist Lana Del Ray participated in a writing session at the Audio Chateau.

481.    Despite Ms. Koons still being under contract with Audio Up, she was now prohibited from attending the sessions, or from even being present at the Audio Chateau, which was supposed to be a creative space for any signed writer to use.

482.    From this session, Audio Up artist Clayton Johnston landed the single "Tough" on Lana Del Ray's album.

---

[15]    *See* https://www.audible.com/series/Sound-Therapy-Audiobooks/B0CSPT7CLQ (last visited December 31, 2024).

COMPLAINT

483.    It became abundantly clear that Mr. Gutstadt's prior invitations to these types of events and writing sessions were only conditioned on Ms. Koons submitting to a sexual relationship with him, the CEO of Audio Up.

484.    As time passed, Ms. Koons continued to be retaliatorily excluded from even more Audio Up events and opportunities:

- In April 2024, Audio Up attended Stagecoach Festival, a yearly musical festival in California, in its capacity as a publishing company, but Ms. Koons was not invited. This was the first time Ms. Koons was not invited to such a festival since she signed with Audio Up, which was also a significant networking opportunity.

- On May 31, 2024, Audio Up published a newsletter in which all songwriters except for Ms. Koons were promoted. The newsletter also highlighted "Emo Prom Night," a project to which Ms. Koons significantly contributed, but for which she received no credit in the newsletter. This deliberate omission undermined Ms. Koons's contributions to Audio Up and her professional standing. Notably, to this day, Ms. Koons continues to be excluded from the newsletter.

- In June 2024, Audio Up hosted a two-night event at Harriet's Rooftop, a restaurant and bar in Nashville, for the Country Music Awards Fest. In stark contrast to previous years, Ms. Koons was not invited. In fact, in 2023, Ms. Koons attended multiple shows on behalf of Audio Up, and in 2022, she performed at the Fest on behalf of the Company. Her inexplicable exclusion this year was a clear act of retaliation, which further marginalized her professionally.

- In June 2024, Audio Up hosted a writing camp in Tennessee from which Ms. Koons was once again excluded, but which was attended by many other Audio Up songwriters.

485.    To put it lightly, Ms. Koons has endured relentless retaliation from Mr. Gutstadt, severely damaging her career.

486.    Despite her significant contributions and past involvement in high-profile events and projects, Ms. Koons has been systematically excluded from key opportunities, erased from newsletters, and denied rightful recognition.

COMPLAINT

487.   Indeed, Mr. Gutstadt has even barred other artists from working with Ms. Koons.

488.   In June 2024, Ms. Koons reached out to Audio Up artists Bonnie Dymond, Abby Anderson, Brooke Butler, and Architracks to set up songwriting sessions.

489.   After several attempts by Ms. Koons to coordinate writing sessions, these artists stopped responding to Ms. Koons, which, upon information and belief, was the result of Mr. Gutstadt's efforts to blacklist Ms. Koons.

490.   In or around June 2024, Anthem expanded its business relationship with Audio Up by forming a new publishing joint venture, further reinforcing its role as a joint employer with shared responsibility for the working conditions and operations involving Ms. Koons.

491.   Mr. Gutstadt's deliberate and vindictive behavior has marginalized Ms. Koons, stunting her professional growth and obstructing her visibility within the industry.

492.   As a result of the immense trauma Ms. Koons has endured caused by Mr. Gutstadt, she has suffered and continues to suffer from profound emotional distress.

493.   Even after Mr. Gutstadt became aware of Ms. Koons's intention to bring forth the claims alleged in this complaint, and despite explicit instructions to cease harassing Ms. Koons, on September 6, 2024, Mr. Gutstadt "liked" Ms. Koons's Facebook page. This deliberate act by Mr. Gutstadt was an unmistakable attempt to intimidate Ms. Koons in her efforts at vindicating his violation of her rights.

**D.**    **The Sexual and Physical Abuse Ms. Burke Endured at the Hands of Mr. Gutstadt Has Caused Lifelong Harm**

494.   After enduring more than **seven years** of relentless abuse from Mr. Gutstadt, followed by over a year of intensive therapy with her psychiatrist and countless hours of sound therapy, the scars of Ms. Koons's past still linger, a constant reminder of the profound impact of the trauma she endured.

COMPLAINT

495.    Ms. Koons suffers from Post-Traumatic Stress Disorder (PTSD), a condition that permeates every aspect of her life. She experiences anxiety, intrusive thoughts, and debilitating flashbacks that can be triggered by the smallest reminders of her abuse.

496.    Nightmares and sleepless nights have become a regular part of her existence, and even ordinary situations can provoke feelings of panic and vulnerability.

497.    The psychological toll has left her grappling with self-doubt, a diminished sense of worth, and an overwhelming struggle to separate her identity from the years of manipulation and exploitation she endured.

498.    Recently, while filming, Ms. Koons sustained bruises on her arms from performing a stunt.

499.    Initially, she dismissed the incident, snapping a photo to share with her girlfriends, lightheartedly joking about "doing her own stunts."

500.    But when she later opened her photo gallery on her phone and saw the images of her bruises, she was overcome with an unexpected wave of grief.

501.    The sight of the bruises instantly transported her back to the years of abuse, triggering memories of the physical and emotional pain she had endured.

502.    The moment served as a stark reminder that there will never be anything trivial or humorous about the marks left behind by violence and trauma.

503.    Ms. Koons has exhausted her administrative remedies under the California Fair Employment and Housing Act and has received a "Right to Sue" letter.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT,**
**CAL CIVIL CODE § 52.5**
**(Against All Defendants)**

504.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

COMPLAINT

505.   Plaintiff is a victim of sex trafficking within the meaning of Cal. Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civil Code § 52.5.

506.   Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of Cal. Civ. Code § 52.5.  Specifically, Defendant Jared Gutstadt perpetrated sex trafficking of Ms. Koons by requiring her to engage in forced sexual acts in multiple jurisdictions, and all Defendants benefitted from Ms. Gutstadt's venture by holding Ms. Burke, an artist signed with Defendant Audio Up and Anthem Entertainment, captive to Mr. Gutstadt's demands.  At all relevant times, Defendants participated in and facilitated the harboring and transportation of Plaintiff for purposes of sex induced by force, fraud, or coercion.

507.   Audio Up and Anthem Entertainment (the "Corporation Defendants") have financially and otherwise benefited as a result of these acts and omissions by keeping Mr. Gutstadt, the erratic and abusive CEO of Audio Up and partner of Anthem Entertainment, content.  Both companies benefited from facilitating his behavior to the extent it covered up Mr. Gutstadt's wrongdoings and kept Ms. Koons silent.

508.   At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities. Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

509.   As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress and anxiety, humiliation, embarrassment, post-traumatic stress disorder, depression, economic harm and other consequential damages.

510.   Plaintiff also seeks reasonable attorneys' fees as provided under Cal. Civil Code § 52.5.

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SECOND CAUSE OF ACTION
### BATTERY/SEXUAL BATTERY UNDER CALIFORNIA LAW
### (Against Defendant Jared Gutstadt)

511.  Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

512.  In performing the conduct described above, Defendant Gutstadt committed a battery against Plaintiff by intentionally engaging in unlawful, intentional, and offensive touching or application of force to Plaintiff's person.  Defendant Gutstadt's actions amount to violations under CA Penal Law §§ 243.4, 243.4(e), and 243.4.

513.  As a result of Mr. Gutstadt's alleged conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, anxiety, depression, economic harm, and other consequential damages.

514.  The conduct of Mr. Gutstadt described above was willful, wanton, and malicious.  At all relevant times, Mr. Gutstadt acted with conscious disregard for Plaintiff's rights and feelings, acted with knowledge or with reckless disregard that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause physical injury, fear, and/or pain and suffering to Plaintiff.  As described herein above, Plaintiff is entitled to recover punitive damages and exemplary damages from Mr. Gutstadt according to proof at trial.

515.  This action is timely because it falls within Cal. Civ. Proc. Code § 340.1 and is brought during the one-year time period set forth in that section.  The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injuries suffered as a result of conduct that would constitute sexual offenses defined in Article §§ 261 and 260 of the California Penal Law, and as such acts/or omissions were committed against Ms. Koons when she was over eighteen years of age.

COMPLAINT

1
2
3

**THIRD CAUSE OF ACTION**
**SEXUAL ASSAULT PURSUANT TO THE CALIFORNIA SEXUAL ABUSE AND
COVER UP ACCOUNTABILITY ACT, CAL CIV. PROC. § 340.16**
**(Against All Defendants)**

516.   Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

517.   Defendant Gutstadt subjected Plaintiff to sexual abuse and sexual battery, as defined in Cal. Penal Code §§ 243.4. In doing so, he intended to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such conduct.

518.   The Corporation Defendants were engaged in a "cover-up" as defined in Cal. Civil Code § 340.16(4)(A), because they took concerted efforts to hide evidence relating to the above-described sexual assaults that incentivized individuals to remain silent or prevented information relating to the sexual assaults from becoming public.

519.   At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities. Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

520.   At all relevant times, Plaintiff was a "person providing services pursuant to contract" under Cal. Gov. Code § 12940, subdivision (j).   During her time working with Defendants, Plaintiff arguably (A) "had the right to control the performance of the contract for services and discretion as to the manner of performance; (B) [was] customarily engaged in an independently established business; (C) [had] control over the time and place the work [was]

63

COMPLAINT

performed, suppli[ed] the tools and instruments used in the work, and perform[ed] work that require[d] particular skill not ordinarily used in the course of the employer's work."

521.    As a direct and proximate result of Defendants' unlawful conduct as alleged above, Plaintiff has suffered physical injury, severe emotional distress, anxiety, depression, humiliation, embarrassment, economic harm and other consequential damages.

**FOURTH CAUSE OF ACTION**
**SEX-BASED DISCRIMINATION IN VIOLATION OF FEHA**
**(Against All Defendants)**

522.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

523.    Plaintiff complained of harassment and discrimination that violated FEHA. Cal. Gov't Code § 12940(h). Defendants relentlessly treated Plaintiff differently because of her sex by subjecting her to unwanted comments, touching, and treatment different from her male colleagues. Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

524.    Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages, in an amount according to proof. Defendants authorized or ratified the acts alleged herein. Cal. Civ. Code § 3294. Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

525.    At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities. Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

COMPLAINT

526.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

**FIFTH CAUSE OF ACTION**
**HARASSMENT IN VIOLATION OF FEHA**
**(Against All Defendants)**

527.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

528.   Plaintiff complained of harassment and discrimination that violated FEHA.  Cal. Gov't Code § 12940(g).  Defendants relentlessly harassed Plaintiff by *inter alia*, unwanted touching of her , making inappropriate comments towards her, and subjecting her to unwanted sexual conduct.  As a result of Defendants action or inaction, Plaintiff was subject to additional discrimination, retaliation, and additional sex-based harassment. Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

529.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  Defendants authorized or ratified the acts alleged herein.  Cal. Civ. Code § 3294.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

530.   At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities. Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

COMPLAINT

531.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

**SIXTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF FEHA**
**(Against All Defendants)**

532.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

533.   Plaintiff complained of harassment and discrimination that violated FEHA.  Cal. Gov't Code § 12940(h).  Defendants took no action to ensure that Plaintiff was not retaliated against for having complained.  As a result of Defendants action or inaction, Plaintiff was subject to additional discrimination, retaliation, and additional sex-based harassment.  Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

534.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  Defendants authorized or ratified the acts alleged herein.  Cal. Civ. Code § 3294.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

535.   At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities. Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

COMPLAINT

536.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

**SEVENTH CAUSE OF ACTION**
**FAILURE TO PREVENT UNDER FEHA**
**(Against All Defendants)**

537.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

538.   Plaintiff complained of harassment and discrimination that violated FEHA, nevertheless, Defendants took no action to prevent Plaintiff from enduring harassment or discrimination.  Cal. Gov't Code § 12940(i).  As a result of Defendants action or inaction, Plaintiff was subject to additional discrimination, retaliation, and additional sex-based harassment.  Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

539.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  Defendants authorized or ratified the acts alleged herein.  Cal. Civ. Code § 3294.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

540.   At all relevant times, Anthem acted as a joint employer by exerting financial control and decision-making authority over Ms. Koons's work and professional opportunities.  Anthem shared control over her employment with Audio Up, making it equally responsible for the unlawful treatment she endured.

COMPLAINT

541.    By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

## EIGHTH CAUSE OF ACTION
### DEFAMATION
### (Against Defendant Jared Gutstadt)

542.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

543.    Defendant Jared Gutstadt spread false rumors about Plaintiff's mental health, each of which was false, defamatory, and unprivileged, and had a natural tendency to injure because each concerned Plaintiff's profession and practice and/or caused special damage.  Cal. Lab. Code. 1050.  Defendant Jared Gutstadt acted with actual malice in making the statements, because he knew the statement was false or subjectively entertained serious doubt as to its truth.  The statements were written.  Their republication was reasonably foreseeable.

544.    The defamation committed by Defendant Jared Gutstadt contributed in Plaintiff's loss of reputation, shame, mortification, hurt feelings, emotional distress, and damages to Plaintiff's profession or occupation, unemployment, inability to find gainful, comparable employment, derailed career trajectory, and other harms, resulting in damages to be proven at trial.

545.    For Plaintiff's defamation claim, Plaintiff is entitled to general damages for loss of reputation, shame, mortification, and hurt feelings; to special damages to compensate Plaintiff for damages to Plaintiff's profession or occupation, and to punitive damages.

COMPLAINT

1

## **PRAYER FOR RELIEF**

2    **WHEREFORE**, Plaintiff respectfully requests this Court:

3       i.    For a money judgment representing compensatory damages including

4             consequential damages, lost wages, earnings, and all other sums of money,

5             together with interest on these amounts, according to proof;

6

7       ii.    For a money judgment for mental pain and anguish and severe emotional distress,

8             according to proof;

9      iii.    For punitive and exemplary damages according to proof;

10      iv.    For attorneys' fees and costs;

11      v.    For prejudgment and post-judgment interest; and

12      vi.    For such other and further relief as the Court may deem just and proper.

13

14                     By:  /s/_____

                              Samuel M. Brown, Esq. (State Bar No.

15                              308558)

                           **HENNIG KRAMER LLP**

16                              3600 Wilshire Blvd, Suite 1908

                           Los Angeles, CA 90010

17                              Tel.: 213 310 8301

18                              sam@employmentattorneyla.com

19                              Parisis G. Filippatos, Esq. *(to be*
*admitted pro hac vice)*

20                              Tanvir H. Rahman, Esq. *(to be*

21                              *admitted pro hac vice)*

                           Gabrielle Rosen Harvey, Esq. *(to be*

22                              *admitted pro hac vice)*

                           **FILIPPATOS PLLC**

23                              425 Madison Avenue, Suite 1502

24                              New York, NY 10017

                           Tel: 212 202 0234

25                              Pgf@filippatoslaw.com
Trahman@filippatoslaw.com

26                              grosenharvey@filippatoslaw.com

27                              *Attorneys for Plaintiff Mary Katherine Koons*

28

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury of any and all issues on which a trial by jury is available under applicable law.

Respectfully submitted this 31st day of December 2024.


By:   /s/ _____

Samuel M. Brown, Esq. (State Bar No. 308558)
**HENNIG KRAMER LLP**
3600 Wilshire Blvd, Suite 1908
Los Angeles, CA 90010
Tel.: 213 310 8301
sam@employmentattorneyla.com

Parisis G. Filippatos, Esq. *(to be admitted pro hac vice)*
Tanvir H. Rahman, Esq. *(to be admitted pro hac vice)*
Gabrielle Rosen Harvey, Esq. *(to be admitted pro hac vice)*
**FILIPPATOS PLLC**
425 Madison Avenue, Suite 1502
New York, NY 10017
Tel: 212 202 0234
Pgf@filippatoslaw.com
Trahman@filippatoslaw.com
grosenharvey@filippatoslaw.com

*Attorneys for Plaintiff Mary Katherine Koons*

COMPLAINT